No. 68,355

THE CITY OF OLATHE, KANSAS, *Appellee*, v. MARVIN E. STOTT,
*et al., Appellants.*

(861 P.2d 1287)

Opinion filed
October 29, 1993.

*David C. Stout,* of Chionuma and Associates, P.C., of Kansas City, Missouri, argued the cause, and *Charles S. Scott, Jr.,* of the same firm, and *Robert R. Laing, Jr.,* of Overland Park, were with him on the briefs for appellants.

*Leonard A. Hall,* assistant city attorney, and *Christopher B. Bacon,* of Lowe, Farmer, Bacon & Roe, of Olathe, argued the cause, and *George A. Lowe,* of Lowe, Farmer, Bacon & Roe, of Olathe, was with them on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The landowners appeal jury condemnation awards, claiming that the court erred by admitting evidence of petroleum contamination and, in the alternative, by not instructing the jury on their estoppel theory. The landowners also contend that the court erroneously excluded evidence and that the jury failed to follow the court's instructions. Finding no reversible error, we affirm.

On March 28, 1990, the City of Olathe filed a petition for eminent domain, seeking to condemn eight tracts of land to enable expansion of the 119th Street and I-35 interchange project. The City was dissatisfied with the awards on tract 5, owned by Marvin and Peggy Stott and David and Eileene Hendrix, and tract 6, owned by Arthur and Dejah Seute. The appraisers' awards from which the City appealed were $341,000 for tract 5 and $1,180,000 for tract 6. On June 29, 1990, the City paid an amount equal to the original awards to the clerk of the court and appealed from those awards to the district court. The date of taking for purposes of property valuation was June 29, 1990.

The controversy centers upon leakage from underground gasoline and diesel fuel storage tanks. Both tracts had been operated as service stations for at least the last 25 years. On appeal to the district court, the City claimed that the appraisers had failed to consider evidence of petroleum contamination on tracts 5 and 6.

During the course of trial, appraisers for the City were allowed, over the landowners' objections, to discuss the impact of petroleum contamination on the fair market value of the property. The landowners contend that no evidence of contamination should have been admitted because a specific act, the Kansas Storage Tank Act (Act), K.S.A. 65-34,100 *et seq.*, preempts the more general condemnation statutes, K.S.A. 26-501 *et seq.*, and provides the only relief available in Kansas for contamination damage resulting from leakage of underground storage tanks.

The landowners contend that the City, through its agents, had information concerning the contamination long before the City filed its condemnation action. The landowners claim that the City should have been estopped from claiming any reduction in property value due to contamination because it did not timely disclose

the existence of the contamination to the landowners. Thus, the landowners contend that they were deprived of the opportunity to mitigate damages. In effect, the landowners argue that the City was silent when it had a duty to speak.

During the course of trial, the landowners sought to introduce testimony from Thomas Glinstra, the Olathe city attorney, who would have testified that the City had acquired, on previous occasions, property that was on the Environmental Protection Agency's list of contaminated sites but did not investigate such contamination. The landowners proffered such testimony to impeach the credibility of city appraisers. The trial court ruled that this evidence was not admissible because it was not relevant.

Also, during the course of trial, on cross-examination, the landowners asked the consultant who studied the contamination problem for the City, Robert Sholar, if anyone had instructed him not to tell the landowners of the contamination. Upon objection by the City, the trial court instructed Robert Sholar not to answer because the trial court did not believe the answer to the question was relevant. The landowners contend that the evidence was relevant to establish the City's intent to mislead or deceive the landowners into doing nothing and that the exclusion of this evidence was extremely prejudicial to their equitable estoppel theory. The landowners did not make a proffer of the excluded testimony.

After the trial concluded and the verdict had been read and accepted, the trial court inquired of the jury on the record about how it treated the existence of contamination in reaching its verdict. Briefly, the juror who responded indicated that the jury did consider the contamination and that it reduced the property value by 10% because of the contamination. The landowners contend that this was error.

## Admissibility of Evidence of Contamination

One of the primary purposes in any eminent domain proceeding is to determine the fair market value of the property taken. Underground petroleum contamination necessarily affects the market value of real property. Evidence of such contamination is therefore admissible in an eminent domain action unless, as

the landowners contend, the Act provides the exclusive remedy for petroleum contamination.

The Act essentially establishes a regulatory scheme that imposes certain requirements on owners and operators of above-ground and underground tanks in which regulated substances (petroleum or "hazardous substances") are stored. See generally K.S.A. 65-34,100 *et seq.* and especially 65-34,102(p), (u) (defining regulated substance and storage tank). The Act also authorizes the Kansas Department of Health and Environment (KDHE) to promulgate rules and regulations regarding tank installation, maintenance, upgrading, removal, and cleanup. See generally K.S.A. 65-34,104 through 65-34,111. The Act provides for licensing of tank installers and contractors. K.S.A. 65-34,110, K.S.A. 65-34,111, K.S.A. 65-34,112.

The Act requires owners and operators to notify KDHE of the "tank's existence, including age, size, type, location, associated equipment and uses." K.S.A. 65-34,104(a). The Act also requires owners and operators to supply various information about underground storage tanks (USTs) that are still in ground, but were taken out of service between January 1, 1974, and May 8, 1986. K.S.A. 65-34,104(b). The Act requires KDHE approval for the construction, installation, modification, or operation of a storage tank and allows KDHE to deny, suspend, or revoke such authorization if the owner or operator is not in compliance with various provisions of the Act. K.S.A. 65-34,106(a), (c). The Act requires owners or operators of USTs to provide evidence of financial responsibility sufficient to pay for corrective action and to compensate third parties for cleanup, property damage, and bodily injury resulting from the release of a regulated substance from a UST. K.S.A. 65-34,107; K.S.A. 65-34,102(g). The Act requires owners and operators to provide information about the storage tank to KDHE representatives on request. K.S.A. 65-34,108.

The Act expressly prohibits various activities and makes such conduct a class A misdemeanor. K.S.A. 65-34,109. It also imposes civil penalties and remedies for violations of certain provisions. K.S.A. 65-34,113.

Although the Act imposes liability for "costs of corrective action taken in response to a release from [a] petroleum storage tank"

on the tank's owner or operator, K.S.A. 65-34,115, the Act also establishes an Underground Petroleum Storage Tank Release Trust Fund (the Fund) that may be used to reimburse owners and operators for some (if not most) corrective action costs incurred as a result of petroleum releases from USTs. K.S.A. 65-34,114; K.S.A. 65-34,114a; K.S.A. 65-34,117; K.S.A. 65-34,119; K.S.A. 65-34,119a; K.S.A. 65-34,121.

The Fund will only reimburse for costs of corrective action, which does not include all costs that may be associated with property contaminated by UST releases. K.S.A. 65-34,119. The Act defines "corrective action costs" as costs incurred for the following:

"(1) removal of petroleum products from petroleum storage tanks, surface waters, groundwater or soil;

(2) investigation and assessment of contamination caused by a release from a petroleum storage tank;

(3) preparation of corrective action plans approved by the secretary;

(4) removal of contaminated soils;

(5) soil treatment and disposal;

(6) environmental monitoring;

(7) lease, purchase and maintenance of corrective action equipment;

(8) restoration of a private or public potable water supply, where possible, or replacement thereof, if necessary; and

(9) other costs identified by the secretary as necessary for proper investigation, corrective action planning and corrective action activities to meet the requirements of this act." K.S.A. 65-34,118(d).

In addition to specifying what kinds of costs are covered as "corrective action costs," the Act also expressly provides that certain other costs are not reimbursable from the Fund. For example, the owner or operator is liable for the cost of removing, replacing, or retrofitting tanks. K.S.A. 65-34,118(c)(4); K.S.A. 65-34,119(b)(9). In addition, the Fund is not liable for the loss of business, damages, or taking of property associated with any corrective or enforcement action. K.S.A. 65-34,114a(d). Finally, the Act imposes limits on the total amount of costs it will pay for any one release and the annual aggregate it will reimburse any owner or operator. K.S.A. 65-34,120.

The Act also imposes conditions on the availability of Fund reimbursement. The owner or operator must pay the lesser of the first $100,000 or $3,000 plus $500 per tank. K.S.A. 65-

34,119(b)(1). The Fund may not be used to reimburse owners and operators who are United States government agencies or owners and operators who are not in substantial compliance with the Act. K.S.A. 65-34,119(a)(1), (2). The Fund may not be used to reimburse for corrective action costs incurred at a petroleum production or refining facility. K.S.A. 65-34,119(b)(11). Reimbursement is only available for corrective action approved by the Secretary of Health and Environment for which appropriate records are kept and notice of completion is given. K.S.A. 65-34,119(b)(2), (4), (6). The owner or operator also must enter into a consent agreement with KDHE that incorporates specific provisions. K.S.A. 65-34,118(c). No reimbursement is available if (1) the release was due to the owner's or operator's willful or wanton conduct; (2) the owner or operator is behind in money owed to the Fund; (3) the release was from an unregistered UST; (4) the owner or operator violates any provision of the consent agreement required by K.S.A. 65-34,118(c); (5) the owner or operator obstructs KDHE's investigation efforts; (6) the owner or operator is not in substantial compliance with the Act; or (7) the owner or operator did not report or take corrective action in response to a release. K.S.A. 65-34,119(d).

The landowners' primary argument appears to be that the Kansas Storage Tank Act is a specific statute that preempts all other common law or statutes that might address funding the cleanup cost incurred because of releases from USTs. Accordingly, the landowners argue, it is not appropriate to consider the impact of such contamination on property value in this eminent domain proceeding.

The City contends that the trial court properly admitted evidence of the contamination because the funding available under the Act only mitigated, but did not eliminate, all adverse effects of the contamination. The landowners do not contend that the Act eliminated all adverse effects of the contamination, but argue that because it expansively addresses contamination from UST releases, it provides the only relief available.

The landowners cite three Kansas cases for the proposition that a specific statute, complete in itself, controls over other statutes that might deal with the same subject matter in some general or incidental way. The landowners cite *Szoboszlay v. Glessner*, 233

Kan. 475, 664 P.2d 1327 (1983); *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869, 811 P.2d 860 (1991); and *Meinhardt v. Kansas Power & Light Co.*, 8 Kan. App. 2d 471, 661 P.2d 820 (1983). Although the cases do stand for the proposition the landowners claim, they are not pertinent to this case.

In *Szoboszlay*, the court held that the appeal time limit specific to small claims actions applied rather than the general time limit applicable to all (other) limited actions. 233 Kan. at 479-80. Similarly, in *Early Detection Center*, the court determined that "[a]lthough the statutory laws relating to general corporations are applicable to professional corporations, the professional corporation laws take precedence over any provision of the law regulating general corporations." 248 Kan. at 876. *Meinhardt* involved the application of a specific statute specifying prejudgment interest in a condemnation action and a general statute regarding postjudgment interest. 8 Kan. App. 2d at 473-74. Each case the landowners cite involved the court's choice between general statutes that might apply to a situation and a statute that specifically addressed the issue before the court. In such cases, Kansas law holds that the specific statute controls. We are not faced with such a choice in this case.

The primary case on which the landowners rely states that "statutes complete in themselves, relating to a specific thing, take precedence over general statutes or over other statutes which deal only incidentally with the same question." *Szoboszlay*, 233 Kan. at 479. The Kansas Storage Tank Act is not "complete in itself" with respect to the issue of cleanup costs. Reimbursement from the UST Fund is not automatic, but is contingent upon complying with various statutory requirements. See K.S.A. 65-34,119. Even when reimbursement is available, the Fund does not cover all costs associated with petroleum contamination. See K.S.A. 65-34,118(d); K.S.A. 65-34,119(a), (b); K.S.A. 65-34,120. The Act does not cover reduction in property value attributable to risk or stigma associated with the contamination that may remain after the property is cleaned up to KDHE's satisfaction.

In further support of their position, the landowners rely on *Department of Health v. Hecla Min. Co.*, 781 P.2d 122 (Colo. App. 1989). They contend that *Hecla Mining* stands for the proposition that funding of the cost of environmental remediation

should be pursued in an action brought pursuant to the statute specifically enacted to address such contamination. Reliance on *Hecla Mining* is misplaced.

*Hecla Mining* was a condemnation action brought pursuant to specific statutory authority for states to condemn uranium mill sites for the purpose of cleaning up radiation contamination. 781 P.2d at 124-25 (citing 42 U.S.C. § 7914[a] [Supp. II 1978] and Colo. Rev. Stat. § 25-11-303[1][d][1982]). The landowners argue that because the State in *Hecla Mining* filed its condemnation action pursuant to that specific statutory authority, *Hecla Mining* supports their contention that the City's only recourse for dealing with the petroleum contamination on tracts 5 and 6 is the recourse provided by the Kansas Storage Tank Act.

*Hecla Mining* requires no such conclusion. First, *Hecla Mining* did not hold that condemnation pursuant to the statutory authority was the State's only option. The court simply did not address that issue. Second, the Kansas Storage Tank Act has no comparable condemnation provision. Third, as noted above, reimbursement from the Fund is not automatic, but is contingent upon complying with various statutory requirements. See K.S.A. 65-34,119. Fourth, even when reimbursement is available, the Fund does not cover all costs associated with petroleum contamination. See K.S.A. 65-34,118(d); K.S.A. 65-34,119(a); K.S.A. 65-34,120. The Act does not address what appears to be the primary cost at issue here—the reduction in value attributable to stigma and risk.

### Equitable Estoppel Instruction

In *Holley v. Allen Drilling Co.*, 241 Kan. 707, Syl. ¶ 4, 740 P.2d 1077 (1987), we defined equitable estoppel as

"the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts."

The landowners claim that the City should be estopped from claiming any reduction in property value due to contamination because it did not timely disclose the existence of the contami-

nation to the landowners, which deprived the landowners of an opportunity to mitigate the property damage.

The landowners acknowledge that in order for a party to be estopped by silence, the complaining party must show (1) the silent parties' intent to mislead or willingness to deceive, (2) knowledge or reason to suppose that someone is relying on that silence, and (3) as a result of that reliance, that someone is acting or about to act as he or she would not otherwise act. See, e.g., *Turon State Bank v. Bozarth*, 235 Kan. 786, 790, 684 P.2d 419 (1984). The landowners then claim that the court should have instructed the jury on equitable estoppel because: (1) Terracon Environmental, Inc., the City's consultant, told the lessee of tract 5 that it would notify the lessee if it "found anything" and did not notify the lessee when it found contamination; (2) the City knew of the contamination as early as March 1989, but no one told the landowners until days before the condemnation action was initiated; (3) Terracon admitted it knew the tanks were leaking in May 1989 and that they would have continued to leak until removed, thereby exacerbating the problem; and (4) the landowners thereby were deprived of the opportunity to mitigate the damage.

"A party is entitled to an instruction explaining its theory of the case where there is evidence to support it." *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991). The record in this case does not support the landowners' claim that they were entitled to an instruction on equitable estoppel.

The evidence at trial indicated that both tracts 5 and 6 had been operated as service stations. Robert Sholar, an environmental engineer with Terracon, testified on behalf of the City about the contamination and cleanup methods. In the course of its investigation of the site, Terracon determined that there was soil and groundwater contamination at the site.

Sholar testified that the information about the nature and extent of contamination was developed through a phased series of environmental assessments. Normally, a phase I environmental assessment does not require sampling or testing, but includes a site visit and the collection of information about the property from regulatory authorities. If the results of those efforts indicate that contamination may be present, then Terracon recommends

a phase II assessment, which includes intrusive sampling of whatever environmental media the phase I assessment indicated might be contaminated.

In this case, the phase I assessment was a combination of the typical phase I assessment (site visit and collection of information from regulatory authorities) and some intrusive sampling because the presence of USTs suggested possible contamination. The intrusive sampling here involved several soil borings to specific depths and installation of four groundwater monitoring wells. The soil borings provided information about the characterization of soils, hydrology of the site, and soil contamination.

After phase I, KDHE agreed with Terracon that contamination was present, that the available data did not indicate the scope of the problem, and that additional work was needed to define the scope of the problem and determine the appropriate remediation. Terracon then conducted a phase II assessment involving additional soil borings and groundwater monitoring wells. The phase II assessment also was done in phases—Terracon installed half of the deep water wells and then sent the data to KDHE to see if additional wells were necessary. Additional deep wells along the perimeter of the property did not indicate that contamination was migrating off site.

The soil and groundwater contamination was at or above KDHE "action levels," levels at which KDHE requires cleanup. KDHE required soil and groundwater remediation. Terracon prepared three remediation options for KDHE's review. Option 1 involved very limited removal and treatment of soil and required about 12 years of surface groundwater treatment and 15 years for deep groundwater treatment. Option 2 required removal of contaminated soil, some of which would be disposed of off site and some of which would be treated on site by aeration. Option 2 required 3-5 years for surface groundwater treatment and 10 years for deep groundwater treatment. According to Sholar, if one considers inflation rates, option 2 is the better choice economically. Option 3 required removal of more soil and was the most expensive option proposed. Terracon recommended and KDHE selected option 2.

The option 2 remediation plan ultimately selected by the City and KDHE included:

(1) a groundwater recovery or "interceptor" trench to intercept contaminated groundwater so that it could be pumped to a treatment center before discharge;

(2) removal and off-site disposal of some contaminated soil;

(3) on-site treatment (by aeration) of some contaminated soil;

(4) removal of USTs and lines; and

(5) removal of asbestos.

The court allowed evidence of the total cost of option 2. Evidence of the amount of cleanup costs that were not reimbursable from the Fund also was admitted. As discussed earlier in this opinion, if owners and operators of storage tanks comply with the Act's requirements, the Fund will reimburse most cleanup costs except the cost of the actual physical removal of the tanks and surrounding concrete. Because the Fund covers only costs attributable to UST releases, it does not reimburse other cleanup costs, such as the cost of asbestos or solid waste removal.

According to Sholar's testimony at trial, the nonreimbursable expenses at the Overland Truck Plaza site, tract 6, totaled $46,150 "under the assumption that environmental assessment costs are reimbursable." At the Apco site, tract 5, $15,450 would not be reimbursable.

Several serious problems exist with the landowners' estoppel theory. Problems listed below support a conclusion that the trial court did not err in refusing to instruct the jury on equitable estoppel.

First, Robert Sholar, the only representative of Terracon who testified, testified that he did not recall telling the lessee of tract 5 that he would notify the lessee if Terracon "found anything." Although Bruce Craig, the lessee of tract 5, testified that Sholar and Bob Fine, Terracon representatives, said they would call him if they found something on the property, Sholar's testimony makes that a disputed fact. When Craig called Terracon in June of 1989, he was told that it had not yet completed its study. The evidence supports that statement.

Second, Sholar did not admit the tanks were leaking at the time he prepared his May 1989 report or that they would have continued to leak until they were removed from service. Contrary to the claim of the landowners, Sholar specifically declined to

express an opinion about whether the tanks were leaking at the time he prepared the May 1989 report:

"Q: And specifically you suspected that the underground storage tanks were leaking; correct? Or the distribution lines or both?

"A: I don't think we had any conclusion as to they are leaking, meaning leaking at present. We may have at that time had some reason to believe that they had leaked at least some time in the past.

"Q: And if they had leaked in the past, it was likely that they were leaking at that time?

"A: Well, not necessarily."

Despite counsel's attempts to secure an unequivocal admission that if the tanks were leaking in May 1989, they would continue to leak until removed, Sholar equivocated a great deal:

"Q: And if, in fact, those tanks were corroded and were leaking in May of 1989 when your report was prepared, they would have continued to leak and further contaminate the property until they were removed from service; correct?

"A: As I think I have stated previously, if they were leaking, if they remained in service, if the level of product in the tank was above the leak hole in the tank, and if there was no higher hydrostatic pressure outside the tank, a water level above the leak level, assuming all those conditions were favorable towards the leak, I would have to say a leak would continue.

"Q: So the answer is yes?

"A: Given those assumptions, the answer is yes."

Thus, the landowners' efforts to establish an express promise by the City's agent (Terracon) to disclose the results of its investigation depend on a disputed fact, not uncontroverted evidence as the landowners claim. Although even controverted evidence might support giving an instruction, Terracon's alleged "promise" was made to one lessee on one of the tracts at issue. Such a statement would not necessarily create a duty of the City to any or all of the landowners.

Moreover, the City has a defensible position that it did timely disclose the final results. The assessment was done in phases. Although the initial round of sampling disclosed the existence of contamination, additional investigation was necessary to determine the scope of the problem. A May 1989 report from Terracon to the City indicated that there was some contamination on both sites. A September 1989 report expressed doubt about whether groundwater treatment would be necessary; a November 1989

report contained information on the groundwater flow; and a January 22, 1990, report contained the three remediation options. The landowners received the January 22, 1990, report in March 1990. The investigation was not complete until that January report was finished.

As the City notes, a party who asserts estoppel must show prejudice. *Ford v. Willits*, 9 Kan. App. 2d 735, 745, 688 P.2d 1230 (1984). Accord *Holley*, 241 Kan. 707, Syl. ¶ 4 (party asserting estoppel must show rightful reliance and that it would be prejudiced if the other party is not estopped); *Turon State Bank*, 235 Kan. at 790 (party asserting estoppel must show that as a consequence of its reliance it is acting or will act as it would not otherwise act). The landowners have not shown that they were prejudiced by the City's silence.

The prejudice the landowners claim is that the problem was exacerbated by the City's delay in informing the landowners of the problem and that the landowners were deprived of the opportunity to mitigate the damage. The evidence suggests that the contamination occurred over a long period of time. The properties had been operated as gas stations for 25 to 30 years. There was evidence of deep bedrock groundwater contamination.

There was some evidence that some of the tanks that were removed had large holes, which might support a conclusion of leakage between May 1989 and March 1990. Given the deep widespread contamination and the long-term use of the property, it appears that the bulk of the problem did not occur in a few months. Moreover, Sholar testified that whether the tanks leaked between May 1989 and the date of removal depended on several other factors (such as whether the product level was above the hole and whether there was hydrostatic pressure).

In addition, the landowners could not have fixed the contamination problem in the months between the May 1989 report and March 1990 (when the landowners learned of the contamination). The Act requires that KDHE approve a corrective action plan before reimbursement is available, and a plan cannot be developed until the nature and extent of the contamination is known. Finally, the landowners continue to insist that (a) they are not liable for the cleanup costs and (b) the contamination should not affect property values. Given this, it is indeed difficult to conceive

of how the landowners' alleged reliance on the City's silence caused them to act as they otherwise would not have acted.

### Exclusion of Testimony of Thomas Glinstra

At trial, the landowners proffered that Thomas Glinstra, the Olathe city attorney, would testify that the City had acquired property that was on the EPA's list of contaminated sites but did not investigate contamination on that property and that the City's perception of the contamination's impact on the value of tracts 5 and 6 had changed over time. The trial court ruled that this evidence was not admissible because it was not relevant.

A trial court's decision concerning the admissibility of evidence will not be disturbed on appeal absent a showing of abuse of discretion. *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 11, 815 P.2d 528 (1991); see *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991). "An abuse of discretion exists only when no reasonable person would take the view adopted by the trial court." *Enlow*, 249 Kan. 732, Syl. ¶ 9. This general principle applies to rulings on the relevancy of evidence. *Tucker v. Lower*, 200 Kan. 1, 6, 434 P.2d 320 (1967).

The issue before this court is thus whether the trial court abused its discretion in excluding Glinstra's testimony about the City's purchase of other contaminated property and its changing perception about the impact of the contamination on the value of tracts 5 and 6. Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). The landowners argue the material fact that the excluded evidence tends to prove is that the City's appraisers were not credible witnesses.

The landowners argue that the City's failure to consider petroleum contamination on adjacent property indicates that the City did not perceive contamination as detrimental to property value, which in turn diminishes the City's appraisers' credibility. The fact that the City investigated potential contamination on tracts 5 and 6 and did not investigate contamination on adjacent property that was on an EPA list of contaminated property is not alone sufficient to make the evidence relevant to the City's appraisers' credibility. First, and most importantly, there is no indication that the same appraisers evaluated that other property, which makes the impact of this evidence on the City's current

appraisers' credibility minimal. At best, the evidence would show only that the City responded differently to other contaminated property. Moreover, even if the same appraisers had appraised both properties, there was no indication that the appraisers did not consider the contaminated state of the other property in assessing its value. There also is no indication that the other property was contaminated by petroleum or that it had long been property on which a potentially pollution-producing industry had operated. Thus, there is no indication that the same potential for extensive, long-term, below-surface contamination existed. Finally, if the property was on an EPA list of contaminated properties, the EPA may have already investigated the contamination and made the results of its investigation available to the City.

Similarly, reasonable people could differ about the relevance of the proffered testimony of Glinstra about the City's allegedly changing approach to the contamination's impact on the value of tracts 5 and 6. The landowners' claim seems to be that the City first believed that it was entitled to a dollar-for-dollar offset of cleanup costs and that it only started considering stigma and risk when the Act was amended so that it was eligible for reimbursement from the Fund. Thus, the landowners seem to be claiming that the City's appraisers concocted the notion that stigma and risk would decrease the property's value when the possibility of reimbursement from the Fund eliminated the prospect of a dollar-for-dollar offset.

The landowners contend that a difference between what the City believed at one point in time and what its appraisers did at a later time affects the appraisers' credibility. The proffered testimony only indicated that it was the City's intent "to assert a claim of a dollar-for-dollar offset against the properties." The Act was amended in 1989 to permit possible reimbursement for some of those costs, and in January 1992, the City's experts testified that the property value was reduced because of stigma and risk. The fact that the City thought it was entitled to a dollar-for-dollar offset for cleanup costs before the Act was amended to create even the possibility of reimbursement is not entirely unreasonable, nor is it particularly relevant. The City's failure to articulate (or perhaps even realize) in 1989 that the properties' values might be reduced because of risk or stigma is not surprising

or particularly relevant. The City hired experts to determine the impact of contamination on property value. In short, the fact that the City thought one thing in 1989 and its experts had an additional, but not mutually exclusive, notion in 1992 does not support the conclusion that the experts' testimony is not credible.

Even if the testimony would have stated that the appraisers thought in 1989 that the City should get a dollar-for-dollar offset and later reduced the value of the property because of stigma and risk, it would not necessarily be relevant to credibility. First, there is no indication that the appraisers would not have reduced the value for stigma and risk *in addition to* the dollar-for-dollar offset if the dollar-for-dollar offset had remained available. Both of the City's appraisers reduced the value for unreimbursable cleanup costs in addition to stigma and risk. Second, the appraisers determined it was appropriate to reduce the value for stigma and risk as a result of their study of the property and the contamination's impact on other comparable property values. It was an opinion formed over time after investigation. The trial court did not err in excluding the testimony as irrelevant.

## Exclusion of Testimony of Robert Sholar

The landowners contend the court erred in excluding Sholar's response to the question whether the City had instructed him not to tell the landowners about the contamination. As noted in the discussion of Issue III above, the trial court's decision to exclude testimony as irrelevant will not be reversed absent an abuse of discretion. If reasonable people could differ about the relevance of the evidence, this court will not conclude that the trial court abused its discretion. The landowners contend that the excluded evidence had a tendency to prove the City intended to mislead or deceive the landowners into doing nothing about the contamination by keeping from them the existence of the contamination.

Generally, this court will not reverse a judgment because of the erroneous exclusion of evidence unless a party proffers the evidence. See, *e.g., Enlow,* 249 Kan. 732, Syl. ¶ 10; K.S.A. 60-405. Because the landowners did not proffer the excluded evidence, we will not reverse the judgment.

## Jury Instructions

The landowners argue on appeal that a 10% reduction was contrary to the court's instruction No. 4, which told the jury in pertinent part to "consider all the factors actually bearing upon value which by the evidence were shown to exist, not as separate items, but only as they as a whole affect market value." Instruction No. 4 was based upon PIK Civ. 2d 11.03. The landowners contend that the jury considered contamination as a separate item and allocated a particular value to it (10%), which was then subtracted from the value of the property. Thus, the landowners contend that the jury failed to follow the instructions of the court in arriving at a value for the property taken.

The landowners did not object to the verdict at trial and did not preserve this issue for appeal. We have held that absent an objection before the jury is discharged, a party cannot later assert an objection to the verdict. *Kitchen v. Lasley Co.*, 186 Kan. 24, 28, 348 P.2d 588 (1960).

However, upon consideration of the issue raised, we do not believe that the jury's 10% reduction for contamination was actually contrary to the court's instruction. The court instructed the jury to consider the factors "not as separate items, but as they as a whole affect market value." The statute and case law on which this instruction is based suggest that "as they as a whole affect market value" means "to the extent they affect market value." K.S.A. 26-513(d), which describes factors to be considered in determining just compensation, provides that pertinent factors "are not to be considered as separate items of damages, but are to be considered only as they affect the total compensation." In addition, *Rostine v. City of Hutchinson*, 219 Kan. 320, 323-24, 548 P.2d 756 (1976), provides that "improvements be considered only to the extent they enhance the value of the whole property and not as separate items." By reducing the property value by 10% because of the contamination, the jury considered the extent to which the contamination affected the total value of the property. The 10% figure has meaning only as it relates to the whole. It appears from the juror's comment that the jury merely reduced the property value by 10% to account for the contamination. In fact, the response of the juror was that "the whole thing was

10%. We didn't divide it up per se. The potential risk involved was more important than the stigma."

Finally, K.S.A. 60-441 prohibits the use of evidence concerning the mental processes by which a verdict was determined. In all likelihood, it was an accident that the judge's dialogue with the jurors even appears in the record. The judge indicated that he was curious about how they treated the contamination issue because it might be useful to him in settlement discussions on other cases. The jurors were not sworn as witnesses, and their verdict already had been accepted. The City is correct that the juror's statements concern "the mental processes by which the verdict was determined." Such evidence is not admissible in a proceeding concerning the validity of the verdict. See, *e.g.*, K.S.A. 60-441; *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 47, 815 P.2d 506 (1991) (jurors' alleged statements that some of them agreed to find plaintiff less than 50% negligent if damages were kept low were inadmissible because they involved the jury's mental processes).

One final comment needs to be made about the City's motion to dismiss the appeal. The City claimed that no notice of appeal had been filed with respect to tract 6 and that the landowners' failure to notify the lessees of the appeal warrants dismissal of the appeal. We have determined that the landowners have met procedural requirements for effecting this appeal, and we reaffirm our prior decision to deny the City's motion to dismiss.

Affirmed.