No. 72,538

MICHELLE SHIRLEY, *Appellee*, v. U. DUANE SMITH, M.D.,
*Appellant*.

933 P.2d 651

Opinion
filed March 7, 1997.

*Thomas M. Sutherland*, of Holbrook, Heaven & Fay, P.A., of Kansas City, argued the cause, and *Brent G. Wright*, of the same firm, was with him on the briefs for appellant.

*Rene S. Young*, of Denning & Young, LLC, of Salina, argued the cause, and *Gary D. Denning*, of the same firm, was with her on the briefs for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: In this medical malpractice case, the jury returned a verdict of $457,000 in favor of the plaintiff, Michelle Shirley. Dr. U. Duane Smith appealed. Shirley filed a cross-appeal, then abandoned it. The Court of Appeals reversed and remanded for a new trial. *Shirley v. Smith*, 22 Kan. App. 2d 424, 916 P.2d 730 (1996). Shirley filed a petition seeking review of the Court of

Appeals' decision on damages and inadmissibility of evidence of the Board of Healing Arts' (BOHA) public censure of Dr. Smith. On July 11, 1996, this court granted Shirley's petition for review.

Shirley raises two issues on appeal: (1) whether her claim for loss of time spent self-catheterizing is economic or noneconomic damages, and (2) whether evidence of the BOHA proceedings against Dr. Smith is admissible.

On April 16, 1991, Dr. Kepka, a family physician in Ellsworth, Kansas, saw Shirley, who complained of abdominal pain. At that time, she was 17 years old and a junior in high school. Dr. Kepka had a blood sample drawn. Based on the low platelet count shown by the laboratory study, Dr. Kepka hospitalized Shirley the following day. He asked Dr. Smith to consult with him.

On April 18, Dr. Smith made three unsuccessful attempts to obtain a bone marrow specimen from Shirley's iliac crest. Shirley testified that she felt pressure during the first attempt and electrical shock sensations during the second and third attempts. Immediately after the procedure, Shirley experienced lower back pain. After she had been taken back to her room and had gotten in bed, "the pain really hit." She was given some pain medication, and then her legs were numb for about an hour.

On April 20, Dr. Kepka transferred Shirley to the hospital in Salina. Shirley was started on cortisone. Her platelet count increased each day. Although encouraged to do so by Dr. Anderson, Shirley adamantly refused to undergo another bone marrow aspiration.

While hospitalized in Salina, Shirley was pressing down on her lower abdomen to make her bladder empty and she complained that when she wiped her perineum it felt numb. Catheterization to check for urine left in the bladder after Shirley tried to empty it produced nearly a liter of urine.

Dr. Anderson looked to see where the needle sticks from Dr. Smith's attempts to take a bone marrow specimen were located "with the idea there's something wrong with the nerves to the bladder and to the perineum." Dr. Anderson saw two marks, which she estimated to be ¼ inch and ½ inch from Shirley's spine. An MRI scan done on April 25 showed blood outside the wrapping

around where the nerves descend from the spinal cord and blood within the spinal canal where the spinal fluid is and where the nerves come down from the spinal cord. Nerves pressed and/or irritated by blood do not function properly. Dr. Anderson testified that the most likely explanation for the blood being present was that the spinal canal had been punctured during the bone marrow aspiration procedure, either by the Novocaine needle or the bone marrow needle. Dr. Anderson testified that she had never encountered a case of a spontaneous spinal bleed occurring in the lower spine from a low platelet count.

Dr. Manguoglu, a neurosurgeon, was asked to consult when Dr. Anderson found blood in Shirley's spinal canal. He noted two puncture marks "pretty much on the midline" of Shirley's back. Dr. Manguoglu testified that the first "MRI scan showed extensive hemorrhage, intraspinal hemorrhage extending from the mid thoracic region all the way down basically to the tailbone." He testified that within a reasonable degree of medical certainty Shirley's bladder disfunction was permanent and resulted from the hemorrhage. In his opinion, the hemorrhage was caused by her spinal canal being punctured when the puncture marks visible on Shirley's back were made. Dr. Manguoglu gave the opinion that "there was no other explanation why she should suddenly have paralysis and numbness and these complaints." He testified that he had seen the puncture sites and that a patient may experience electrical shock-like sensations if a nerve at that level is touched during a spinal tap.

Dr. Romeiser, a urologist, saw Shirley at the request of Dr. Anderson. He was of the opinion that Shirley's bladder disfunction was "due to the bleed from the bone marrow puncture." He recommended that Shirley be placed on "intermittent self-catheterization, where she takes a catheter and empties her bladder every four hours to keep her bladder from overfilling." The purpose of self-catheterization is to allow her to urinate while lessening the likelihood of urinary infection or damage to the kidneys or bladder.

By the end of May 1991, the amount of urine Shirley retained after emptying her bladder was, in Dr. Romeiser's opinion, at a "tolerable level." He asked her to stop the self-catheterization and

changed her antibiotic. Because she had to push on her bladder to urinate, Shirley was again required to intermittently self-catheterize after she had a splenectomy in July 1991.

At the request of Dr. Smith's counsel, Dr. Weigel, a professor of surgery in the division of urology at the University of Kansas Medical Center, examined Shirley in October 1993. He performed "more sophisticated studies" than those used by Dr. Romeiser. He advised that Shirley resume self-catheterization in order to prevent progressive damage from straining "so severely" to empty her bladder. He recommended yearly sonograms to evaluate her kidneys and monitoring for infection. He also recommended that Shirley undergo a surgical procedure, called a pin-up procedure, to keep her from leaking urine when she is in certain positions or is active. According to Dr. Weigel, "[S]he probably would have to self-catheterize after that. I doubt that she could void."

Dr. Riffel, an internist who performs bone marrow aspirations as part of his practice, testified that based on descriptions of the procedure given by Dr. Smith and his assistants, no needle had penetrated Shirley's spinal cord. Dr. Riffel assumed that the aspiration needle was inserted "about three inches to the right" of Shirley's midline. He testified that it would be possible for a needle inserted within a half inch of midline to penetrate the spinal canal.

Another internist who performs bone marrow aspirations, Dr. Neubauer, testified that he would have inserted the needle approximately 2 inches from the spine. In his opinion, bone marrow aspiration attempts at 3 and 2½ inches from the midline, where the testimony of Dr. Smith and his assistants placed the procedures on Shirley, would meet the standard of care. Dr. Neubauer testified, "Based upon [Dr. Smith's] description of the procedure I don't see how he could have got into the spinal canal."

With regard to her condition at the time of trial, Shirley testified that she still had the problem with leaking urine. She wears a pad when engaging in physical activities. She avoids drinking fluids when she is away from home to cut down on leakage and to avoid having to self-catheterize. At home, the bathroom is set up for the self-catheterization procedure, but elsewhere she requires help from someone who will hold a mirror for her. Shirley must cath-

eterize herself every 4 hours in order to empty her bladder. She estimated it takes her 7 to 10 minutes to complete the self-catheterizing process. She anticipated having the surgical pin-up procedure when she had vacation time, and she had been advised by Dr. Romeiser that any children she had should be delivered by Caesarian section.

Future economic loss of $135,000 was a part of the jury's verdict of $457,000 in favor of Shirley. The Court of Appeals concluded that it was reversible error for the trial court to allow Shirley "to claim economic damages for her loss of time spent in catheterizing herself." 22 Kan. App. 2d at 424. The Court of Appeals stated: "Plaintiff's claim for loss of time spent self-catheterizing must be included in her claim for noneconomic damages; it cannot be recovered as economic damages or loss." 22 Kan. App. 2d at 427.

The Court of Appeals agreed with Dr. Smith's argument that "time lost while self-catheterizing is a loss of enjoyment of life or an inconvenience, which is *not* economic damage." 22 Kan. App. 2d at 426. The rationale of the Court of Appeals was stated as follows:

"Since plaintiff testified she could catheterize herself during 'off' time and did not testify that task interfered with her earning capacity in any way, her 'loss of time' cannot be claimed as economic damages. Rather, it properly falls under the noneconomic category that includes loss of enjoyment of life, pain and suffering, and disability. See *Leiker v. Gafford*, 245 Kan. 325, 340, 778 P.2d 823 (1989) (loss of enjoyment of life is a component of pain and suffering but not a separate category of nonpecuniary damages)." 22 Kan. App. 2d at 426-27.

The jury was instructed in accordance with the Pattern Instructions for Kansas as follows:

"In interpreting and applying the last instruction, there are three types of damages that you may allow:

1. Noneconomic loss. This type of damage includes (a) pain and suffering and (b) disability, disfigurement and any accompanying mental anguish suffered by plaintiff to date and those which plaintiff is reasonably expected to suffer in the future;

2. Medical expenses. The reasonable expenses of necessary medical care, hospitalization and treatment received and reasonable expenses of necessary medical care, hospitalization and treatment reasonably expected to be needed in the future; and

3. Economic loss. This type of damage includes loss of time or income to date by reason of plaintiff's disabilities and that which plaintiff is reasonably expected to lose in the future.

"You will be given a verdict form in which you must itemize the amounts of noneconomic, medical, and economic damages awarded to date and those awarded for future injuries and losses."

This instruction is identical to PIK Civ. 2d 9.012 (1995 Supp.). The damages portion of the verdict form conforms to this instruction. It appeared as follows:

"[If you found Dr. Smith to be at fault], then what total amount of actual damages do you find was sustained by Michelle Shirley?

| | | |
|---|---|---|
| A. | Noneconomic loss to date | $10,000.00 |
| | (Includes bodily injury, disability, pain and suffering, mental anguish, and inconvenience) | |
| B. | Future noneconomic loss | $175,000.00 |
| | (Includes bodily injury, disability, pain and suffering, mental anguish, and inconvenience) | |
| C. | Medical expenses to date | $30,000.00 |
| D. | Future medical expense | $102,000.00 |
| E. | Economic loss to date | $5,000.00 |
| | (Includes loss of time, reduced earning capacity, loss of income and other economic loss) | |
| F. | Future economic loss | $135,000.00 |
| | (Includes loss of time, reduced earning capacity, loss of income and other economic loss) | |
| | TOTAL DAMAGES (Add A through F) | $457,000.00" |

Dr. Smith does not argue that the jury was misinstructed or that the verdict form was improper. Instead, Dr. Smith complains that Shirley was permitted to present evidence of an hourly value for her time spent self-catheterizing. When Shirley was testifying about the damages she was claiming for the loss of an hour every day for life, Dr. Smith's counsel objected to her ascribing a monetary value to that lost time. Counsel argued that it was not economic damages and not susceptible to any kind of mathematical solution. The district court disagreed, stating, "I am going to rule that it's economic damages, not pain and suffering." The physical evidence is a 3-page exhibit setting out elements and amounts of Shirley's damages. Plaintiff's Exhibit No. 33, entitled "Summary of Future Medical Expenses," shows the following:

"Value of Lost Time
Low = 6.20/hr          84,448
High = 13.68/hr        186,330"

As Dr. Smith points out, the jury's award for future economic loss, $135,000, lies halfway between $84,448 and $186,330. (84,448 + 186,330 = 270,778 ÷ .5 = 135,389). With regard to this exhibit, Dr. Smith's counsel objected to the mathematical computation of damages for 1 hour a day for life. The objection was overruled.

The Court of Appeals' decision rests on a link between loss of time and earning capacity: "Loss of time prior to trial and decreased earning capacity after trial are both recoverable as 'loss of time.' See *Dyer v. Keith*, 136 Kan. 216, 219, 14 P.2d 644 (1932). Loss of time is tied to a plaintiff's earning capacity. 22 Am. Jur. 2d, Damages §§ 151, 153." 22 Kan. App. 2d at 426.

The Court of Appeals cites *Leiker v. Gafford*, 245 Kan. 325, 778 P.2d 823 (1989), for the principle that Shirley's loss of time "properly falls under the noneconomic category that includes loss of enjoyment of life, pain and suffering, and disability." 22 Kan. App. 2d at 426. The Court of Appeals gives the following synopsis of the holding from *Leiker*: "[L]oss of enjoyment of life is a component of pain and suffering but not a separate category of nonpecuniary damages." 22 Kan. App. 2d at 427.

In *Leiker*, the jury was allowed to award damages for loss of enjoyment of life as a distinct category of damages. The amount awarded was $150,000. The defendants in *Leiker*, like the plaintiff in the present case, argued that the item of damage at issue was not listed among the subheadings of the statutory category of noneconomic injuries and losses. The court disagreed that the listed components of the category of noneconomic damages were exclusive:

"Although defendants' reliance on the statute is somewhat persuasive, the language of the statute does not preclude this court from recognizing loss of enjoyment of life as a separate category of noneconomic damages, and it certainly does not preclude its consideration as an element or factor in assessing damages for one of the other types of noneconomic damages listed in subsection (a)(1). Nothing in K.S.A. 1988 Supp. 60-249a purports to restrict the categories of noneconomic damages to those listed in subsection (a)(1). If the legislature had intended

to preclude by statute separate awards for loss of enjoyment of life, it could easily have done so simply by stating that noneconomic damages would be limited to those categories specified in subsection (a)(1). Thus, we conclude the statute does not resolve the issue." 245 Kan. at 338.

Thus, *Leiker* settles the matter of the nonexclusivity of the subcategories of noneconomic injuries and losses. As in *Leiker*, therefore, in the present case the statute does not resolve the issue.

Conceding that there are no Kansas cases in which loss of time and loss of income are defined, Dr. Smith relied heavily on a decision from Indiana. In *Rieth-Riley Constr. Co. v. McCarrell*, 163 Ind. App. 613, 325 N.E.2d 844 (1975), the question of whether a plaintiff who was unemployed at the time of injury may recover damages for time from the date of injury to trial was answered in the affirmative. The Indiana court called the element of damages which was at issue "impairment of earning ability." That court stated:

"Although called 'impairment of earning ability,' that which the plaintiff is entitled to recover is actually the value of the *time* which he has lost and probably will lose because of the injury. 22 Am. Jur. 2d, Damages § 89. Historically, many courts have recognized that this element of damage—value of time—is comprised of two distinct sub-elements which are usually denominated:

(1) loss of time, and

(2) decreased earning capacity. See, *Scott v. Nabours* (1973), 156 Ind. App. 317, 296 N.E.2d 438; 22 Am. Jur. 2d, Damages §§ 89, 90, 92.

"The first of these sub-elements, loss of time, refers to the time which the plaintiff has lost prior to trial because of his injury, while the second, decreased earning capacity, designates the time which probably will be lost after trial. In both cases, it must be emphasized that the compensable element is *time*." 163 Ind. App. at 618.

In PIK Civ. 2d 9.012, economic loss is defined as "loss of time or income" from the date of injury forward, bearing in mind that the jury must distinguish between past and future losses. Thus, loss of time is not confined to the period between injury and trial, as it is in Indiana, but it does seem to be linked to earning capacity. Shirley attempts to dispute this notion by pointing out that loss of time and loss of income are connected by "or" rather than "and." She would interpret the disjunctive terms of the Pattern Instruction to mean that the loss of time is an element of damages in

addition to loss of income. Her argument, however, is unconvincing. The language of the Pattern Instruction seems clearly to reflect the rule applied by the Indiana court—impaired earning ability is compensable whether measured in time or actual earnings. See 22 Am. Jur. 2d, Damages §§ 151, 153, 154. We agree with the Court of Appeals that "loss" of time is tied to earning capacity.

Having said that, we do not agree that Shirley's loss of time for self-catheterization cannot be claimed as economic damages. Shirley consistently has referred to this element of her damages as loss of time. However, the pretrial order states: "Plaintiff claims damages for future medical expenses, including value of self-catheterization as set forth in plaintiff's economic analysis report of Gary Baker between: $147,273.00-$282,281.00." As previously noted in this opinion, Shirley's trial Exhibit No. 33 listed the value of lost time for self-catheterization as part of her future medical expenses. Although she has identified it with the loss of time which is used in the Pattern Instruction to refer to loss of earning ability prior to trial, her need to self-catheterize is a treatment reasonably expected to be needed in the future due to Dr. Smith's negligent performance of the bone marrow aspiration. The evidence showed that it was possible for Shirley to urinate without catheterization, but catheterization was prescribed to lessen complications from an imperfectly voided bladder and from straining to void. In other words, catheterization for Shirley is a preventive treatment.

As noted by the Court of Appeals, quoting *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 352, 789 P.2d 541 (1990): " 'Economic damages include *the cost of medical care*, past and future, and related benefits, *i.e.*, lost wages, loss of earning capacity, and other such losses.' " (Emphasis added.) 22 Kan. App. 2d at 426. The reasonable expense of treatment is a proper element of economic damages. The question whether a reasonable expense may be assessed as an item of damage for self-administered treatment does not seem to have been directly adjudicated in reported opinions of this state. Services rendered by family members, however, have been allowed as elements of damages in this court and elsewhere. In *Lewark v. Parkinson*, 73 Kan. 553, 85 Pac. 601 (1906), the court approved an award which included expenses in-

curred by reason of the injuries sustained by Mrs. Parkinson when she attempted to get out of a runaway horse-drawn cab. "[T]he time of the sons in nursing and caring for" Mrs. Parkinson was allowed as part of the expenses. 73 Kan. at 555. Proprietors of the cab argued that the sons' time should be disallowed because they were duty bound to care for her in any event and one of the sons was paid by his employer during the time he claimed to have cared for his mother. The court disagreed:

"Reasonable compensation for nurse hire and attendance was a proper item of recovery, notwithstanding the persons who performed the services were relatives who might have been bound to take care of her without compensation, if she paid or became liable for the expense and the service was required. In *Brosnan et al. v. Sweetser*, 127 Ind. 1, 26 N.E. 555, where the services were rendered by members of the family, it was said:

'If this be done by some good friend or member of the family, who donated his services, that is the good fortune of the appellee, and a matter with which the persons liable have no concern. If she had paid ten times the true value of such services she could only have recovered what such services were reasonably worth.' (Page 8.)

"(See, also, *Trapnell v. City of Red Oak Junction*, 76 Iowa, 744, 39 N.W. 884; *Kendall v. The City of Albia*, 73 Iowa, 241, 34 N.W. 833; *The Pennsylvania Company v. Marion*, 104 Ind. 239, 3 N.E. 874; *Varnham v. The City of Council Bluffs*, 52 Iowa, 698, 3 N.W. 792.)" 73 Kan. at 555-56.

Even though Shirley's "loss of time" may have been mislabeled, it was not miscategorized. For the purpose of applying the statutory limitation on noneconomic damages, therefore, any error was harmless. " 'In reviewing an award for an objective element of damages such as loss of past and future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss.' " *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, 618, 828 P.2d 923 (1992). The evidence must be reviewed in the light most favorable to Shirley, who prevailed in the district court. See *Smith v. Massey-Ferguson, Inc.*, 256 Kan. 90, 115-16, 883 P.2d 1120 (1994). For the jury's purpose of placing a monetary value on the self-catheterization treatment, the evidence of what an employer would have paid Shirley for her time is not out of line. Furthermore, Dr. Smith concedes that there is evidence to support the jury's figure, which was the midpoint of

the range suggested by Shirley's economics expert witness. Although presented in the belief that the element of damage was loss of time, the evidence serves as well to establish what Shirley or another non-medical person would be paid for the time it takes to administer the treatment. Thus, if there was error with respect to the label applied to the element of damages, it was harmless.

We next consider the admission of evidence of the BOHA proceedings against Dr. Smith. Dr. Smith objected to the admission of two separate segments of the orders with which BOHA proceedings against him were concluded. One is the BOHA finding that Dr. Smith deviated from the standard of care in performing the bone marrow aspiration on Shirley and the resulting 1-year prohibition on his performing bone marrow aspiration procedures. The other is BOHA's public censure of Dr. Smith for his providing false information in applications for privileges to Irwin Army Community Hospital, Fort Riley, Kansas, and Prison Health Services. Objections to the two segments were on two separate and independent grounds. A third sanction, a 60-day license suspension, also was imposed on Dr. Smith. It appears to relate to both the care of Shirley and providing false information.

Over the objection of Dr. Smith, the trial court admitted redacted (and retyped so that they did not appear to be redacted) versions of initial and final orders issued by BOHA into evidence. In the redacted initial order, the following finding was made:

"With regard to patient MS, the presiding officer finds that Smith deviated from the applicable standard of care by accidently penetrating the spinal column in the attempted bone marrow aspiration. The resulting spinal cord hematoma was the cause of a urinary retention problem which was subsequently successfully treated. Smith's actions in this regard constitute ordinary negligence."

In the redacted final order, it is stated that this finding of the presiding officer was adopted. It also is stated that the presiding officer's recommendation to limit Dr. Smith's license with respect to the performance of bone marrow aspirations was adopted. In addition,

"[1](a) Respondent may not perform the above-mentioned procedure for a period of at least one year, at which time Respondent may petition for termination of this limitation.

"(2) The Board adopts the recommendation of the Presiding Officer pertaining to public censure. Respondent is hereby publicly censured for violation of K.S.A. 65-2836(b) as defined by K.S.A. 65-2837(b)(17) for providing false information in applications for privileges to Irwin Army Community Hospital, Fort Riley, Kansas, and Prison Health Services.

"(3) In addition, based upon the above findings of fact and conclusions of law, the Board hereby suspends Respondent's license and ability to practice medicine and surgery in the State of Kansas for a period of sixty (60) days . . . ."

The district court prohibited inquiry about the nature of the false information, which was Dr. Smith's failure to report previous revocation of his privileges in Colorado.

The Court of Appeals concluded that admission of evidence of Dr. Smith's public censure by BOHA required reversal of the judgment:

"BOHA's public censure of defendant for providing false information in his applications for staff privileges at numerous hospitals had nothing to do with defendant's care of plaintiff. At least with respect to the BOHA censures having nothing to do with the hospital in question and nothing to do with the issue of defendant's care of plaintiff, we cannot rule the admission was harmless error. Plaintiff's case was strong, but not overwhelming. Defendant did present the testimony of two doctors who testified he could not have punctured plaintiff's spinal column. Accordingly, we must reverse and remand for a new trial." 22 Kan. App. 2d at 425-26.

The Court of Appeals' conclusion about the admissibility of evidence of BOHA's action with regard to Shirley's care was that it was subject to the balancing test of K.S.A. 60-445. Thus, "[a]t the new trial, whether the BOHA findings with respect to defendant's conduct in plaintiff's case and his prohibition from performing further bone marrow aspirations are admissible is left to the trial court's discretion under K.S.A. 60-455." 22 Kan. App. 2d at 426.

Shirley's petition for review sought this court's scrutiny of the Court of Appeals' decision on her loss of time damages and inadmissibility of BOHA's public censure of Dr. Smith for providing false information. She did not ask this court to review the Court of Appeals' conclusion that admission of evidence of BOHA's action with regard to the bone marrow aspiration was subject to judicial discretion. Dr. Smith filed a response to the petition for

review in which he addressed only the issues raised by Shirley. He did not file a cross-petition for review.

Supreme Court Rule 8.03(g)(1) (1996 Kan. Ct. R. Annot. 48) provides, in pertinent part: "In civil cases, the Supreme Court may, but need not, consider other issues that were presented to the Court of Appeals and that the parties have preserved for review." Dr. Smith's failure to cross-petition for review of the Court of Appeals' decision on admissibility of evidence of BOHA's action with regard to the bone marrow aspiration or even to raise the issue in his response to Shirley's petition for review constitutes a failure to preserve the issue for this court's review. For this reason, our review will be limited to evidence of BOHA's public censure of Dr. Smith for providing false information.

The court's review of this question is governed by the following standards:

"K.S.A. 60-261 provides that an error in the admission of evidence is not a ground for granting a new trial unless it affected the substantial rights of the parties. It also is well settled that

'[a] trial court's decision concerning the admissibility of evidence will not be disturbed on appeal absent a showing of abuse of discretion. *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 11, 815 P.2d 528 (1991); see *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991). "An abuse of discretion exists only when no reasonable person would take the view adopted by the trial court." *Enlow*, 249 Kan. 732, Syl. ¶ 9. This general principle applies to rulings on the relevancy of evidence. *Tucker v. Lower*, 200 Kan. 1, 6, 434 P.2d 320 (1967).' *City of Olathe v. Stott*, 253 Kan. 687, 700, 861 P.2d 1287 (1993)." *Smith v. Massey-Ferguson, Inc.*, 256 Kan. at 122.

Before Shirley's counsel was allowed to examine Dr. Smith during her case in chief, a conference was held at the bench in which the trial court's rulings on admissibility of evidence of BOHA proceedings was discussed at length. Shirley's counsel stated that it was her understanding that the court had ruled that the evidence of Smith's giving false information "went to credibility. And credibility was also at issue, therefore I could use it in my case in chief also." Defense counsel urged the court to exclude evidence of the false information on the ground that it would lead directly into an area of improper inquiry. In response, Shirley's counsel agreed that she would not ask Dr. Smith why he left Brighton, Colorado. She

further stated: "And as far as falsification I won't ask what information was false. I'll just state were you publicly censored [*sic*] for falsifying hospital privileges without getting into the details of it." In the context of explaining his ruling on what was and was not to be redacted from the BOHA orders, the district court judge stated:

"I am leaving in that portion about public censure for providing false information for the reason that I have previously determined that that had something to do with credibility. I exclude all of the information regarding false information from the initial order because in the initial order those references are tied up with what happened in Colorado, which I don't think is admissible here at all. What's left in the final order about false information makes no reference to Colorado in any way, nor to what applications, what information on the applications was falsified. It simply says that false information was provided and that's enough."

Before Dr. Smith took his place on the witness stand, the district court judge instructed the jury:

"Members of the jury, you previously have heard reference made to an order of the State Board of Healing Arts. And it appears that during the examination of Dr. Smith there will be many references made to that document. I want to admonish you at this point to be sure that you understand that this particular document has been admitted by me as being admissible evidence in this trial. You are not bound by the rulings of the State Board of Healing Arts. You should consider this as one piece of evidence along with all the rest of the evidence that you hear in this trial. You may give this piece of evidence such weight as you feel it deserves."

The substance of this instruction was repeated when instructions were read to the jury before deliberations.

In the Court of Appeals, Dr. Smith argued that evidence of BOHA's public censure was irrelevant and, if not irrelevant, then inadmissible under K.S.A. 60-445 as being more prejudicial than probative. He also argued that the evidence was inadmissible under K.S.A. 60-447 and, if admissible, then admissible only for the purpose of impeachment.

The Court of Appeals, as we have seen, concluded that the evidence was irrelevant. The analysis was limited to relevance of the BOHA action to Dr. Smith's care of Shirley. No consideration of relevance to Dr. Smith's credibility was expressed by the Court of Appeals.

"Relevant evidence" is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Where Dr. Smith inserted the needle unquestionably is a material fact. His trial account was evidence having a tendency to prove where he inserted the needle. His giving false information in applications for doctor's privileges was evidence having a tendency to show that his account might be fabricated. There would seem to be no question that the evidence of Dr. Smith's public censure for giving false information was relevant within the meaning of 60-401(b).

This does not end our inquiry. Relevant evidence may be inadmissible under more specific provisions. K.S.A. 60-420 provides, in part: "Subject to K.S.A. 60-421 and K.S.A. 60-422, for the purpose of impairing . . . the credibility of a witness, any party . . . may examine the witness and introduce extrinsic evidence concerning any conduct by him . . . and any other matter relevant upon the issues of credibility." K.S.A. 60-422 provides, in part: "As affecting the credibility of a witness . . . (d) evidence of specific instances of his . . . conduct relevant only as tending to prove a trait of his . . . character, shall be inadmissible." Evidence of Dr. Smith's giving false information in his applications for privileges to Fort Riley and Prison Services is evidence of specific instances of his conduct. As discussed above, that evidence is relevant only as tending to prove that he is not honest. Dishonesty is a trait of a person's character. Explaining the operation of subsections (c) and (d) of 60-422, this court previously has stated:

"[A] witness's credibility may be attacked by showing the witness has character traits for dishonesty or lack of veracity, but those traits may only be proven by opinion testimony or evidence of reputation. Those traits may not be proven by specific instances of the witness's past conduct. [Citations omitted.]" *State v. Smallwood*, 223 Kan. 320, 326-27, 574 P.2d 1361 (1978).

As affecting the credibility of Dr. Smith, therefore, the BOHA public censure evidence should be inadmissible under 60-422.

Shirley urges the court to focus on K.S.A. 60-421 instead. She would analogize the evidence of Dr. Smith's giving false information to evidence of a conviction of a crime involving dishonesty or false statement. K.S.A. 60-421 provides, in part: "Evidence of the conviction of a witness for a crime not involving dishonesty or false

statement shall be inadmissible for the purpose of impairing his or her credibility." Shirley cites *State v. Deffenbaugh*, 217 Kan. 469, 474, 536 P.2d 1030 (1975), as precedent for admitting adjudications which do not amount to criminal convictions. There, the court held: "Adjudications of delinquency in juvenile court involving dishonesty or false statement constitute convictions of crime within the meaning of K.S.A. 60-421 and are admissible for the purpose of impeaching the credibility of a witness." 217 Kan. 469, Syl. ¶ 1. In support of her argument that the BOHA proceedings should be distinguished from run-of-the-mill specific instances of conduct because the rights of the accused were safeguarded by BOHA, Shirley relies on federal criminal cases. They involve a federal rule of evidence which allows certain inquiry into specific instances of conduct on cross-examination and which has no counterpart in the Kansas rules of evidence. We do not find her argument persuasive.

In the Court of Appeals, Dr. Smith relied on K.S.A. 60-447, which provides, in part:

"[W]hen a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that . . . evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible . . . ."

"When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447." K.S.A. 60-446. Shirley responds that the statute is inapplicable because "the evidence was not being offered to prove a character trait as tending to prove conduct on a specified occasion but solely as to credibility at trial." Although that appears to be correct, 60-422(d) does apply to credibility at trial.

Although the public censure evidence was inadmissible, we conclude its admission was harmless. In this regard, the Court of Appeals stated: "[W]e cannot rule the admission was harmless error. Plaintiff's case was strong, but not overwhelming. Defendant did present the testimony of two doctors who testified he could not have punctured plaintiff's spinal column. Accordingly, we must

reverse and remand for a new trial." 22 Kan. App. 2d at 425-26. In fact, the testimony of the two doctors presented by Dr. Smith was that Shirley's spinal canal could not have been penetrated if the procedure had been performed as Dr. Smith testified it was. Drs. Riffel and Neubauer assumed the aspiration needle was inserted about 3 inches from the midline, based solely upon Dr. Smith's account. On the other hand, the two treating doctors did observe the puncture marks. Dr. Anderson testified that the marks were approximately ¼ inch and ½ inch from Shirley's spine. Dr. Manguoglu noted two puncture marks "pretty much on the midline." Dr. Smith gave varying accounts, from inserting the needle 5 inches from midline to 3 inches on the first try and 2½ inches on the second try.

Dr. Smith's defense was that he did not insert the needle closer than 2½ inches to Shirley's spine and thus did not puncture her spine. The only evidence to support that defense is Dr. Smith's testimony. As noted, Dr. Smith's accounts of where he inserted the needle differ from one another, differ from the observations of the treating physicians, and form the basis upon which his medical experts would absolve him of fault.

" 'Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded.' " *Tamplin v. Star Lumber & Supply Co.*, 251 Kan. 300, 308, 836 P.2d 1102 (1992) (quoting *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 [1986]).

The evidence that a puncture to plaintiff's spinal canal caused extensive intraspinal bleeding which resulted in injury and damages to the plaintiff is not only overwhelming, it is uncontroverted.

The evidence of the public censure for Dr. Smith's giving false information consisted of a paragraph in the redacted final order of BOHA. It was not played up. In his brief in the Court of Appeals, where both aspects of the BOHA evidence were treated in one issue, Dr. Smith complained that Shirley's counsel repeatedly referred to the BOHA orders in opening statement and examination of witnesses. None of the many record references given by Dr. Smith involves the public censure portion of the final order. We

do not find that Dr. Smith's substantial rights were adversely affected, and the admission of the public censure was harmless error.

The judgment of the Court of Appeals reversing the district court is affirmed in part and reversed in part. The judgment of the district court is affirmed.