631 N.W.2d 131 (2001)
262 Neb. 235
The BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Appellant,
v.
Sue H. CHAULK and Kevin L. Blehm, wife and Husband, et al., Appellees.
No. S-00-212.
Supreme Court of Nebraska.
July 20, 2001.
*134 Rodney M. Confer, Trev E. Peterson, and Corey L. Stull, of Knudsen, Berkheimer, Richardson & Endacott, Lincoln, for appellant.
Howard P. Olsen, Jr., of Simmons, Olsen, Ediger, Selzer, Ferguson & Carney, P.C., Scottsbluff, and Thomas D. Oliver, for appellees Sue H. Chaulk, Kevin L. Blehm, et al.
Terry Curtiss, of Curtiss, Moravek, Curtiss & Margheim, Alliance, for appellees Daniel N. Dailey and Janet K. Dailey.
HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
MILLER-LERMAN, Justice.

NATURE OF CASE
The Burlington Northern and Santa Fe Railway Company (BNSF) filed an action in the district court for Morrill County. The sole remedy BNSF sought in the district court was injunctive relief permitting it to conduct surveys and tests on the land of property owners who had refused access for such purposes (defendant property owners). BNSF appeals from the order of the district court entered on February 9, 2000, which denied the preliminary and permanent injunctions sought by BNSF and dismissed BNSF's second amended petition. For reasons set forth below, which differ from those articulated by the district court, we affirm.

STATEMENT OF FACTS
The facts essential to our decision are not in dispute. BNSF operates a railroad in Nebraska. A portion of BNSF's railroad track is located in Morrill County, Nebraska. Eastbound trains on this track carry coal from mines near Guernsey, Wyoming, to Northport, Nebraska. At Northport, the BNSF track intersects with track operated by the Union Pacific Railroad, whose dispatchers control the movement of trains through the intersection. The train traffic through this intersection is heavy. BNSF trains are frequently backed up in their efforts to use the intersection, in part because Union Pacific trains are given priority.
From the Northport intersection, the BNSF railroad track runs north and south. The northbound track leads to Alliance, Nebraska. On this route, trains must transverse a steep incline north of Bridgeport, *135 Nebraska, known as the Angora Hill. The track up the Angora Hill has a 1-percent grade, meaning it rises 1 foot for every 100 linear feet of track. As a result of this incline, BNSF utilizes additional locomotives, referred to as "helper consists" or "helpers," to assist loaded coal trains in climbing the Angora Hill. The helpers are added to the back of the loaded trains and push the trains up the 13 1/2-mile hill. In addition to the extra equipment, additional time and personnel are needed to add and remove the helpers from the loaded coal trains, resulting in additional costs to BNSF.
In October 1997, BNSF began to consider laying a new line of track in order to avoid the Angora Hill's steep grade. BNSF contacted Jerry Helm, a railroad consultant who had previously worked for BNSF. Helm was directed to investigate the possibility of a bypass or connection to reduce the grade to .5 percent or less. Helm developed a proposal to bypass the Northport intersection by laying a cutoff track which would run from just east of Bayard, near Prinz, Nebraska, to Angora, Nebraska (bypass route). The new track would be approximately 25½ miles long.
The proposed bypass route had the advantages of avoiding the Northport intersection and the Angora Hill. The proposed bypass route would have only a .5 percent grade, or a rise of 6 inches for every 100 linear feet of track. The land on which BNSF proposed to build the bypass route included land which was owned by the defendant property owners.
BNSF decided to investigate the possibility of constructing the proposed bypass route. To gauge the feasibility of this alternative, BNSF sought to determine whether the land could support the tracks and whether the construction was cost effective. In the fall of 1998, BNSF, through its agent H.C. Peck & Associates, began contacting the owners of the land on which the proposed bypass route would be built (property owners) to gain right-of-entry permits that would allow BNSF to enter upon the property owners' land to conduct certain surveys and tests. Among the surveys and tests that BNSF proposed to conduct on the property owners' land were as follows: an alignment survey; cultural surveys to locate any Native American burial grounds or artifacts; biological and environmental surveys to identify endangered plant and animal species; hydraulic surveys to determine water runoff patterns and wetlands; and geotechnical tests which involved drilling and gathering core soil samples, 2 inches in diameter and approximately 50 feet deep, which samples would need to be drilled and gathered approximately every quarter of a mile. These samples would then be taken to a lab for analysis.
Initially, BNSF sought access to the property owners' land without any compensation. Later, BNSF offered each property owner $500 as an incentive to gain the necessary right-of-entry permits. The defendant property owners refused to grant BNSF the permits which would allow BNSF to conduct its investigations.
On January 14, 1999, as a result of the defendant property owners' refusal to give BNSF the necessary permits, BNSF initiated the instant action seeking injunctive relief as its sole remedy. The second amended petition filed on April 14 is the operative petition for purposes of the present appeal. In its petition filed pursuant to Neb.Rev.Stat. § 76-702 (Reissue 1996), BNSF sought preliminary and permanent injunctions granting BNSF entry to the defendant property owners' land in order to conduct the above-described surveys and tests. On or about July 7, the defendant property owners answered BNSF's petition, denying, inter alia, that BNSF *136 was entitled to the relief it sought and affirmatively alleging that BNSF had failed to allege a public use which would result from its proposed project.
On December 8 and 9, 1999, a bench trial was had on BNSF's petition. A total of 13 witnesses testified, and 16 exhibits were received in evidence. The evidence included testimony by the following BNSF witnesses: Helm; Robert Patton, a former BNSF employee who is the vice president for Mainline Management, Inc., a railroad consulting firm; Kenneth Girodo, a BNSF employee; Gregg Larsen, an employee of H.C. Peck & Associates, BNSF's agent responsible for gaining the right-of-way permits from the property owners; and Jack Moy, a BNSF employee. BNSF's exhibits included maps of the proposed bypass route and a report developed by a team of BNSF personnel headed by Patton, which report "updat[ed] the information in the five-year horizon" plan for coal transportation requirements along BNSF's railroad tracks, including the Morrill County area in question.
In its memorandum order entered February 9, 2000, the district court denied BNSF the relief it requested and dismissed the petition. The district court concluded that although BNSF possessed the requisite statutory authority to condemn property under Nebraska's eminent domain statutes, Neb.Rev.Stat. § 76-701 et seq. (Reissue 1996 & Supp.1999), it could enter upon the defendant property owners' land pursuant to § 76-702, which permits condemnors to conduct precondemnation surveys and examinations, only after it had sustained its burden of proving that its proposed bypass constituted a "public use" rather than a private benefit. Reviewing the evidence, the district court found that BNSF had failed to carry its burden of proof. The district court stated:
By the greater weight of the evidence BNSF's overwhelming purpose for the contemplated bypass route was to eliminate the helper [consists] thereby saving on crews and expensive equipment to increase profits and better compete with the Union Pacific Railroad. The desire to construct the by-pass track was a business decision, an economic decision similar to economic decisions made daily by private businesses to cut costs and increase profits....
Inasmuch as BNSF has failed [to] prove that its contemplated condemnation proceedings would satisfy the "public use" requirement it has no authority under Section 76-702 to enter upon private lands for testing purposes.
The district court denied BNSF's application for preliminary and permanent injunctions and dismissed BNSF's petition.
BNSF appeals.

ASSIGNMENTS OF ERROR
On appeal, BNSF has assigned four errors. BNSF claims, restated, that the district court erred (1) in requiring BNSF to prove its proposed bypass was for a public use before it could enter the defendant property owners' land for the purpose of conducting investigations pursuant to § 76-702; (2) in failing to find that condemnation of land for a rail line is per se condemnation for a public use; (3) in failing to find that BNSF had offered sufficient evidence to prove the proposed bypass was for a public use; and (4) in failing to find that BNSF had negotiated in good faith pursuant to § 76-702. In view of our disposition of this appeal based on resolution of the first assignment of error, we do not reach the second through fourth assignments of error.

*137 STANDARDS OF REVIEW
An action for injunction sounds in equity. On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. White v. Board of Regents, 260 Neb. 26, 614 N.W.2d 330 (2000). Interpretation of a statute presents a question of law. Affiliated Foods Co-op. v. State, 259 Neb. 549, 611 N.W.2d 105 (2000).
The power of eminent domain may be exercised only on the occasion, and in the mode and manner, prescribed by the Legislature. SID No. 1 v. Nebraska Pub. Power Dist., 253 Neb. 917, 573 N.W.2d 460 (1998). Statutes conferring and circumscribing the power of eminent domain must be strictly construed. Id.

ANALYSIS

PRINCIPLES OF SOVEREIGN POWER OF EMINENT DOMAIN
Every citizen in this state has the constitutional right to acquire, own, possess, and enjoy property. Neb. Const. art. I, § 25. A citizen's property may not be taken against his or her will, except through the sovereign powers of taxation and eminent domain. Burger v. City of Beatrice, 181 Neb. 213, 147 N.W.2d 784 (1967). The Nebraska Constitution limits the sovereign's absolute power to take private property by requiring that property owners whose property has been taken or damaged for public use under the eminent domain authority be compensated. Neb. Const. art. I, § 21.
The power of eminent domain may be delegated by the Legislature. Van Patten v. City of Omaha, 167 Neb. 741, 94 N.W.2d 664 (1959). Although railroads are private corporations, they have been given the statutory authority to acquire land through eminent domain. See Neb.Rev.Stat. § 74-308 (Reissue 1996). See, also, Gustin v. Scheele, 250 Neb. 269, 549 N.W.2d 135 (1996). We have stated that "[p]roceedings to subject the property of another for public use under the doctrine of eminent domain must be conducted in the manner prescribed by the statute delegating the power." Spencer v. Village of Wallace, 153 Neb. 536, 544, 45 N.W.2d 473, 477 (1951). See, SID No. 1 v. Nebraska Pub. Power Dist., supra; Engelhaupt v. Village of Butte, 248 Neb. 827, 539 N.W.2d 430 (1995). Pursuant to § 74-308, railroads are required to exercise their eminent domain power in accordance with Nebraska's general eminent domain statutes. See § 76-701 et seq.
Sections 76-701 through 76-724 prescribe the manner and method by which condemnors may exercise the power of eminent domain. It is essential that property taken under the power of eminent domain be for a public use and not a private one. Neb. Const. art. I, § 21; Chimney Rock Irr. Dist. v. Fawcus Springs Irr. Dist., 218 Neb. 777, 359 N.W.2d 100 (1984); Burger v. City of Beatrice, supra.

§ 76-702 AND TEMPORARY TAKING
The district court determined that under § 76-702, it was incumbent on BNSF to establish "the `public use' requirement" prior "to enter[ing] private lands for testing purposes." Section 76-702 provides as follows:
After negotiations have failed, any condemner, or his representative, upon proper identification and after informing the condemnee of the contemplated action is authorized to enter upon any land for the purpose of examining and surveying same in contemplation of bringing *138 or during the pendency of condemnation proceedings under sections 76-701 to 76-724; Provided, when an inventory is made of the damage to personal property by reason of examining or surveying the land by the condemner, or his representatives, a copy of the inventory shall be delivered to the condemnee.
For its first assignment of error, BNSF contends that the district court erred in requiring BNSF to prove its proposed bypass was for a public use before it could enter the defendant property owners' land for the purpose of conducting investigations pursuant to § 76-702.
As more fully explained below, the investigations proposed by BNSF amount to a temporary taking and exceed those activities authorized under § 76-702 pursuant to which statutory provision BNSF filed its petition and sought injunctive relief. Accordingly, although for reasons different than those articulated by the district court, we conclude that the district court correctly denied injunctive relief and dismissed the petition.
BNSF argues that under a strict statutory construction, nothing in the language of § 76-702 requires it to prove that it had an objective of a public use supporting its request to enter the defendant property owners' land for the purpose of conducting the surveys and tests and that the district court erred in denying BNSF its requested preliminary and permanent injunctions to enter the defendant property owners' land.
Section 76-702 authorizes "any condemner... to enter upon any land for the purpose of examining and surveying [the] same in contemplation of bringing or during the pendency of condemnation proceedings under sections 76-701 to 76-724." Accordingly, § 76-702 permits and limits BNSF's entry upon the defendant property owners' land to "examining and surveying." BNSF argues that pursuant to § 76-702, it had the authority to enter upon the defendant property owners' land to conduct tests which the record shows included geotechnical studies, in which core soil samples, 2 inches in diameter and 50 feet deep, are drilled and gathered approximately every quarter of a mile along the proposed 25 1/2-mile bypass route. BNSF contends that its proposed "investigations" are consistent with "examining" under § 76-702. We do not agree.
In discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, as it is the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself. In re Referral of Lower Platte South NRD, 261 Neb. 90, 621 N.W.2d 299 (2001). In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. Id.
Considering the plain language of § 76-702, the authority to enter land granted under § 76-702 for "examining and surveying" prescribes activities far less intrusive than the drilling and sample gathering for geotechnical studies proposed by BNSF. The undisputed evidence in the instant case demonstrates that the tests which BNSF proposes to conduct on the property owners' land, including extracting core samples at depths of 50 feet, exceed "examining and surveying" permitted under § 76-702. Thus, the activities for which BNSF seeks injunctive relief under § 76-702 exceed those activities encompassed by this statute.
*139 In determining that the testing activities proposed by BNSF are more extensive than the "examining and surveying" for which entry is authorized under § 76-702, we note that the Legislature has explicitly authorized certain condemnors to enter upon property prior to instituting a condemnation action to conduct various activities which are more extensive than those permitted under § 76-702. See, e.g., Neb. Rev.Stat. § 2-3232 (Cum.Supp.2000) (natural resources district authorized to enter upon land to "[m]ake studies, investigations, or surveys and do research"); Neb. Rev.Stat. § 15-229 (Reissue 1997) (cities of primary class authorized to enter land in contemplation of condemnation action to "make surveys, examinations, investigations, and tests, and to acquire other necessary and relevant data"); Neb.Rev.Stat. § 39-1324 (Reissue 1998) (Department of Roads granted authority "to enter upon any property to make surveys, examinations, investigations, and tests, and to acquire other necessary and relevant data").
These examples demonstrate that the Legislature is capable of granting a condemnor authority to enter upon property to conduct activities such as tests, investigations, and data gathering in contemplation of filing condemnation actions. The authority granted a condemnor such as BNSF under § 76-702, however, does not include entry upon property for testing or investigating, and, instead, is limited to entry upon land for the purpose of "examining and surveying." It is presumed that the Legislature knowingly limited the precondemnation activities a condemnor may conduct upon property pursuant to § 76-702, and, even if this limitation is by legislative oversight, it is not the office of the courts to legislate into existence greater authority to enter upon land to conduct precondemnation activities than that granted under the statute. See Muir v. Nebraska Dept. of Motor Vehicles, 260 Neb. 450, 618 N.W.2d 444 (2000).
Tests similar to those proposed by BNSF have been considered by other courts. It has been observed that core drilling, such as BNSF proposes to conduct upon the defendant property owners' land in the instant case, is "an intrusion and interference with [one's] rights as a private landowner," which "subverts [the landowner's] right to use and enjoy [the] property in fee simple absolute." Missouri Highway and Transp. Com'n v. Eilers, 729 S.W.2d 471, 473-74 (Mo.App.1987). Such intrusion, described as "dig[ging] up private property," has been defined as a temporary taking, for which a temporary easement must first be obtained. Id. at 473. Compare, County of Kane v. Elmhurst Nat'l Bank, 111 Ill.App.3d 292, 443 N.E.2d 1149, 67 Ill.Dec. 25 (1982) (statute authorizing precondemnation entry upon land for surveys and appraisals does not permit "taking" in form of soil boring or geologic study); Hicks v. Texas Municipal Power Agency, 548 S.W.2d 949 (Tex.Civ. App.1977) (statutory right to conduct precondemnation survey does not include right to conduct core drilling operation).
We conclude that the tests BNSF proposes to conduct upon entry on the defendant property owners' land amount to a temporary taking. A temporary taking has been defined as "the occupancy of land ... or a diminution in value... that is temporary in nature." 2A Julius L. Sackman, Nichols on Eminent Domain § 6.05[3] at 6-72 (rev.3d ed.2001). This court has recognized that the Nebraska Constitution's limit on the sovereign power of eminent domain set forth in article I, § 21, applies to temporary as well as permanent takings. See Whitehead Oil Co. v. City of Lincoln, 245 Neb. 680, 515 N.W.2d 401 (1994) (arbitrary and capricious enactment of zoning ordinance and *140 resulting denial of use permit constituted temporary taking of business property by city for which damages must be paid). See, also, Maloley v. City of Lexington, 3 Neb.App. 976, 536 N.W.2d 916 (1995) (Neb. Const. art. 1, § 21, permits recovery for damages caused by temporary as well as permanent takings). A temporary taking must be accomplished in a manner consistent with the exercise of the power of eminent domain. See Maloley v. City of Lexington, supra.
The power of eminent domain must be exercised "in strict accordance with its essential elements in order to protect the constitutional right of the citizen to own and possess property against an unlawful perversion of such right." Burger v. City of Beatrice, 181 Neb. 213, 220, 147 N.W.2d 784, 790 (1967). The power of eminent domain may be exercised only on the occasion, and in the mode and manner, prescribed by the Legislature. SID No. 1 v. Nebraska Pub. Power Dist., 253 Neb. 917, 573 N.W.2d 460 (1998). Statutes conferring and circumscribing the power of eminent domain must be strictly construed. Id. While the language of § 76-702 permits a condemnor to enter upon land for the purpose of "examining and surveying [the] same," it does not permit entry for the purpose of conducting the type of physical invasion to the land proposed by BNSF. The geotechnical tests and investigations that BNSF seeks to conduct upon the defendant property owners' land exceed the statutory authority given to BNSF under § 76-702 for which injunctive relief of entry for the purpose of conducting such tests and investigations was sought in the petition. The tests amount to a temporary taking which must be accomplished in the mode and manner prescribed by the Legislature for the exercise of the power of eminent domain. Neb. Const. art. I, § 21; Whitehead Oil Co. v. City of Lincoln, supra; Maloley v. City of Lexington, supra.
When the record demonstrates that the district court's decision is correct, although such correctness is based on a different ground from that assigned by the district court, the appellate court will affirm. White v. Board of Regents, 260 Neb. 26, 614 N.W.2d 330 (2000). Accordingly, although based on a rationale different than that articulated by the district court, we affirm the district court's denial of BNSF's request for preliminary and permanent injunctions and dismissal of the petition.

CONCLUSION
As more fully explained above, the investigations proposed by BNSF amount to a temporary taking and exceed those activities authorized under § 76-702 pursuant to which the petition was filed and injunctive relief sought. Accordingly, although for reasons different than those articulated by the district court, we conclude that the district court correctly denied injunctive relief and dismissed the petition.
AFFIRMED
STEPHAN, J., not participating.