No. 86,401

NATIONAL COMPRESSED STEEL CORPORATION, *Appellant*, v. THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, *Appellee*.

(38 P.3d 723)

 Opinion filed January 25, 2002. 

*Don R. Lolli*, of Swanson Midgley, LLC, of Kansas City, Missouri, argued the cause, and *Robert R. Bartunek* and *Heather A. Jones*, of the same firm, and *Charles D. Kugler*, of Kugler & Dickerson, of Kansas City, were with him on the briefs for appellant.

*Timothy P. Orrick*, of Parkinson, Foth & Orrick, L.L.P., of Lenexa, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: National Compressed Steel Corporation (National) sought to enjoin the Unified Government of Wyandotte County/ Kansas City, Kansas, (Unified Government) from undertaking an environmental examination of National's property in conjunction with a pending eminent domain action the Unified Government initiated to acquire real property owned by National. The district court denied National's petition for a permanent injunction. National appeals, claiming (1) the district court erred in denying its petition for a permanent injunction, and (2) it was inappropriate for the same district judge to sit in both the condemnation proceeding and the associated but independent petition for injunction.

National, a metals processing facility, owns eight tracks of land located in Kansas City, Wyandotte County, Kansas. National's customers include city municipalities such as Kansas City, Missouri, and Kansas City, Kansas, and other customers, such as Proctor & Gamble, General Motors, and Colgate.

The Unified Government is a chartered municipal government pursuant to the constitution and laws of Kansas. The Unified Government filed the eminent domain proceeding on April 29, 1999, in the district court of Wyandotte County. On June 2, 1999, the Unified Government filed a motion for an order to allow entry upon National's land to perform extensive environmental testing. National objected, contending that the statutory authority to enter upon its property and make examinations in an eminent domain proceeding did not include the right to perform the extensive environmental testing contemplated by the Unified Government. The district court disagreed and issued an order allowing the Unified Government to enter National's property to perform environmen-

tal testing prior to acquiring any interest in National's property, without requiring the Unified Government to acquire an easement for the environmental testing or to pay compensation for use of National's land to perform the environmental testing.

National moved for reconsideration of the district court's order. In the motion, National renewed its objection based on lack of statutory authority to conduct environmental testing. The motion further contended that (1) the district judge in an original eminent domain proceeding sits in an administrative, not judicial, capacity and, therefore, lacks subject matter jurisdiction to determine the nature and extent of a condemner's powers, to interpret statutes regarding a condemner's powers, and to order environmental testing; (2) environmental testing without condemnation of an easement is a taking without due process of law; and (3) ordering environmental testing without just compensation, notice, and opportunity for the landowner to be heard is a government taking of private property without due process of law. The district court denied National's motion to reconsider.

National filed an application with the Kansas Court of Appeals to take an interlocutory appeal from the district court's order to allow environmental testing. The application was denied by the Court of Appeals without opinion. National then filed with this court a petition for discretionary review of the Court of Appeals' order denying interlocutory appeal. The petition was denied without opinion.

The matter proceeded in the district court. A hearing in the eminent domain proceeding was held on February 4, 2000. The Unified Government moved for immediate environmental testing of National's property for soil and groundwater pollution.

The extensive environmental testing the Unified Government desires to undertake is described in a 111-page work plan with attachments prepared by Browning & Associates, Inc., dated September 7, 1999. The plan indicates the Unified Government proposed to drill 12 soil borings to a depth of 5 feet below groundwater level. It was estimated that the soil borings will be drilled to a depth of 20 to 25 feet below the ground surface. Eight of the borings will be converted to temporary monitoring wells to collect groundwater

samples. The monitoring wells will be constructed with threaded connection, 1-inch ID, Schedule 40 PVC pipe capped at the bottom. The well screen will consist of 0.010 inch slots. A graded, clean cilica sand will be placed in the annulus of the screened interval of each well. A 2-foot bentonite pellet seal will be placed above the sand packing and a flush mount steel protective cover will be concreted into place. Each well will be protected with a locking cap. Soil and groundwater samples will be collected from each location. Monitoring wells with sufficient recharge will be purged by removing a minimum of three well volumes. Monitoring wells that do not recharge sufficiently will be purged until no additional groundwater can be collected. The soil samples will be continuously collected during the drilling operation by driving a split spoon sampler with a 140 lb. hammer. At least three, but not more than four, samples will be collected from each drilling location: the sample at the interface between the fill soil and the native soil, the sample directly above the groundwater level measured at the time of the drilling, and the sample from the bottom of the boring. Auger cuttings will be collected and stored in sealed drums at the site. If sample results indicate that there is no soil contamination, the auger cuttings will be spread out on the site. Water obtained from development and purging will be poured onto the ground to permeate into the soil at the site if the water is not contaminated. If the soil and/or water is contaminated, then disposal options will be explored. Bore holes not covered by permanent/temporary wells will be filled with either bentonite or a sand-cement mixture. The district court granted the Unified Government's motion.

Prior to the February 4, 2000, eminent domain hearing, National filed a petition for a temporary restraining order, preliminary injunction, and permanent injunction regarding environmental testing on its property. The action was assigned to Division 2 of the Wyandotte District Court but, pursuant to local court rules, the action was reassigned to Division 1, where the eminent domain proceeding was assigned and pending. The Unified Government moved to dismiss the injunction action. The motion to dismiss was denied. The parties then agreed that the original eminent domain

proceeding would be stayed pending disposition of the pending injunction action. The district court eventually denied National's request for injunctive relief from the environmental testing.

The Unified Government has not yet condemned an easement on National's property for the purpose of performing the environmental testing and has not yet performed invasive environmental testing on National's property.

## Improper Assignment of Action

National contends that it was inappropriate for the same district judge to determine both the condemnation proceeding and the associated but independent petition for injunction because the judge was required to review his own orders. National argues such action is in contravention of the checks and balances contemplated in Kansas law.

Supreme Court Rule 107 (2001 Kan. Ct. R. Annot. 152) provides, in part:

"In every judicial district the Supreme Court shall designate an administrative judge who shall have general control over the assignment of cases within said district under supervision of the Supreme Court. Assignment of cases shall be designed to distribute as equally as is reasonably possible the judicial work of the district. The administrative judge of each district shall be responsible for and have general supervisory authority over the clerical and administrative functions of the court.

. . . .

"(b) *Trial Court Case Assignment.* Cases shall be assigned under the supervision of the administrative judge. Under his supervision, the business of the court shall be apportioned among the trial judges as equally as possible and he shall reassign cases as necessity requires. He shall provide for the assignment of cases to any special division established in the court. A judge to whom a case is assigned shall accept that case unless he is disqualified or the interests of justice require that the case not be heard by that judge."

The Rules of Court for the 29th Judicial District of Kansas, Wyandotte County, provide that "[i]f there is another case or cases pending between the parties for the same cause, or if companion cases are filed, all cases shall be assigned to the division having the lowest case number." Rule No. 3, Assignment of Cases.

The courts' rules provide for broad discretion on the part of the chief judge in the assignment of cases and provide for judicial econ-

omy in the assignment of cases. Further, the two cases, although they include the same parties, involve different legal questions and theories. Questions regarding the condemner's power of eminent domain and the extent of restrictions on the condemner's power cannot be presented in the eminent domain action; therefore, National sought to raise these issues in its injunction action, a proceeding separate from the eminent domain proceeding. The fact that the same judge was assigned both cases did not create a conflict and did not require the judge to review his own orders.

### Use of Injunction Procedure

Eminent domain is the right and power of government or lawfully designated authority to take private property for public use without the owner's consent upon payment of just compensation. The right is an inherent power of the sovereign and comes into being with the establishment of government and continues as long as the government endures, but its exercise may be limited by the Constitution. *Deisher v. Kansas Dept. of Transportation*, 264 Kan. 762, Syl. ¶ 3, 958 P.2d 656 (1998).

The Unified Government argues that the district court erred in denying its motion to dismiss National's injunction proceeding. The Unified Government contends that an injunction proceeding is not the proper procedure to obtain judicial consideration of National's complaint. The Unified Government asserts that this is the only issue on appeal in this action.

It must be noted that the Unified Government did not appeal the district court's denial of its motion to dismiss and did not cross-appeal. K.S.A. 2000 Supp. 60-2103(h) requires a cross-appeal from adverse rulings to obtain appellate review of those issues. *Grimmett v. S & W Auto Sales Co.*, 26 Kan. App. 2d 482, 484, 988 P.2d 755 (1999). Nevertheless, we find it is necessary to determine if an injunction action properly invoked the jurisdiction of the district court to consider National's claims.

The Unified Government contends that National's petition sounds in the nature of inverse condemnation and argues that because an adequate remedy at law exists through an inverse condemnation suit for taking the subject property, an injunction action

is not an appropriate remedy. The contention is without merit for two reasons.

First, inverse condemnation is an action or eminent domain proceeding initiated by the property owners rather than the condemner and is available only where private property has been actually taken for public use without formal condemnation proceedings and it appears that there is no intention or willingness of the taker to bring such proceedings. *Deisher*, 264 Kan. 762, Syl. ¶ 4.

The Unified Government's filing of condemnation proceedings for the property indicates an intention or willingness to take the property. Furthermore, the Unified Government has not yet conducted environmental testing upon National's property. Therefore, a suit in inverse condemnation is not a remedy at law available to National.

Secondly, questions regarding the condemner's power of eminent domain and the extent of restrictions on the condemner's power cannot be presented in the eminent domain action because such proceeding does not provide a forum to litigate the right to exercise eminent domain or to determine the extent of that right. In an eminent domain proceeding, there is no right to litigate outside issues raised by the condemnee. The right to exercise the power of eminent domain and to determine other issues such as the necessity and the extent of the taking can only be litigated in a separate civil action, usually by suit for injunction. *In re Condemnation of Land for State Highway Purposes*, 235 Kan. 676, Syl. ¶¶ 1, 2, 3, 683 P.2d 1247 (1984).

Under the circumstances, the proper avenue for National's grievance is an injunction proceeding. The district court did not err in denying the Unified Government's motion to dismiss the injunction proceeding.

### Injunctive Relief

Did the district court err in denying National's request for injunctive relief? An injunction is an order to do or refrain from doing a particular act. K.S.A. 60-901. An injunction is an equitable remedy designed to prevent irreparable injury by prohibiting or com-

manding certain acts. An injunction is not appropriate if a remedy at law can furnish the injured party with the full relief to which he or she is entitled. 42 Am. Jur. 2d, Injunctions § 1, pp. 550-51. We have determined that under certain circumstances an injunctive action is proper to litigate the exercise of eminent domain and the extent of that right.

To obtain injunctive relief, National must show: (1) there is a reasonable probability of irreparable future injury to National; (2) an action at law will not provide an adequate remedy; (3) the threatened injury to National outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. See *Sampel v. Balbernie*, 20 Kan. App. 2d 527, 530-31, 889 P.2d 804 (1995).

In *Sampel*, the Court of Appeals reversed the district court's dismissal of a petition for injunctive relief under K.S.A. 60-901 *et seq.* to restrain an individual from harassing, assaulting, and threatening petitioner. The *Sampel* court relied on *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 787 P.2d 716 (1990). These two cases note that injunctive relief is equitable in nature and a substantial showing is required before a court is warranted in ordering a party to do or refrain from doing a certain act. *Kansas East Conf. of the United Methodist Church, Inc. v. Bethany Med. Ctr.*, 266 Kan. 366, 382-83, 969 P.2d 859 (1998).

To show it was entitled to injunctive relief, National provided testimony at the evidentiary hearing that (1) National's customers include national corporations which are concerned about doing business with companies which may be subject to Superfund or other environmental liabilities; (2) if environmental problems are discovered through the Unified Government's proposed testing, it is likely that National will lose some or all of its national corporations as customers, as well as, other customers, and it is likely that its operation could be destroyed; (3) if environmental problems are discovered at National through the Unified Government's proposed testing, it is likely that National's real property would be stigmatized, with the value and marketability of the property significantly reduced; (4) the Unified Government's proposed testing

would disrupt the day-to-day operations of National, creating additional costs and a reduction in profits for National; (5) the Unified Government's proposed testing is likely to create adverse publicity for National which could have a negative impact on National's operation and profitability; (6) if environmental problems are discovered as a result of the Unified Government's proposed testing, National would be exposed to remediation obligations which do not currently exist, such as coming into compliance with various state and federal laws relative to the environment; (7) National has operated at its present location since 1952; (8) the present location of National is particularly suitable for operations as a metals recycling facility; (9) the subject property has been utilized for many years as a metals recycling facility; (10) the Unified Government in the eminent domain proceeding believes that it is necessary to do soil examinations of the subject tract to determine whether contamination has taken place and, if so, if the extent of the contamination is such that it makes the proposed development impractical; and (11) the Unified Government believes it needs to make this determination so that if the tracts are found to be substantially contaminated it may exercise its rights pursuant to K.S.A. 26-507(b), wherein it can abandon its condemnation action.

This showing is sufficient for the district court to consider injunctive relief in this case.

## Subsurface Testing

The Fifth Amendment's just compensation provision is designed to bar government from forcing individuals to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *First Lutheran Church v. Los Angeles County*, 482 U.S. 304, 318-19, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987).

K.S.A. 26-512 provides: "The prospective condemner or its agents *may enter upon the land and make examinations, surveys and maps thereof,* and such entry shall constitute no cause of action in favor of the owners of the land, except for actual damages thereto." (Emphasis added.) National points out that the statute allows surface examinations but does not expressly authorize subsurface environmental testing. Our question is whether the statute

is to be construed to provide that "examinations" encompass extensive subsurface environmental testing.

The interpretation of a statute is a question of law over which this court's review is unlimited. This court is not bound by the district court's interpretation of a statute. *Babe Houser Motor Co. v. Tetreault,* 270 Kan. 502, 506, 14 P.3d 1149 (2000). A statute which confers the right to exercise the power of eminent domain is to be strictly construed in the light of the objectives and the purposes sought to be attained by its enactment. *Concerned Citizens, United, Inc. v. Kansas Power & Light Co.,* 215 Kan. 218, 231, 523 P.2d 755 (1974).

In *City of Olathe v. Stott,* 253 Kan. 687, 861 P.2d 1287 (1993), this court recognized that underground contamination necessarily affects the market value of real property. In *Stott,* the City had information about the contamination long before the City filed its condemnation proceeding. The landowner claimed the City should be estopped from claiming a reduction in property value due to contamination because the City had not timely declared the existence of contamination to the landowner. *Stott* is not helpful because the issue in that case was not whether subsurface testing was included within the definition of "examinations"; the issue was whether evidence of contamination is admissible in an eminent domain action or whether the Kansas Storage Tank Act, K.S.A. 65-34,100 *et seq.,* preempts the Kansas eminent domain statutes and provides the exclusive relief available in Kansas for contamination damage resulting from leakage of underground storage tanks. Because there is no Kansas case on point, we will look to other jurisdictions.

## Other Jurisdictions

The question of whether "examinations" in condemnation proceedings include subsurface environmental testing or core drilling has been addressed in other state courts. In *Town of Darien v. D'Addario,* 26 Conn. L. Rptr. 177 (Conn. Super. 1999), the Connecticut court held that a statute providing that a condemning authority may enter land for "the purpose of inspection, survey, borings and other tests" was constitutional because entering private

property to conduct an inspection for a proposed condemnation fails to qualify as a taking. The *D'Addario* court found that "[a]n overwhelming majority of courts have held that authorizing an inspection and tests on land does not deprive the owner of his private use and possession, especially when the owner receives compensation for damages." 26 Conn. L. Rptr. at ____.

We note that the Connecticut statute provided the condemning authority the right to inspect, survey, and to conduct borings and other tests. The court noted that it is important that the landowner receive compensation for damages caused by the condemning authority in conducting the survey and test.

In *Ind. State Highway Com'n v. Ziliak*, 428 N.E.2d 275 (Ind. App. 1981), the Indiana court held that the trial court properly denied a request by a condemning authority to conduct an intensive archaeological survey upon the property prior to initiation of condemnation proceedings. The relevant eminent domain statute provided that the condemning authority may "enter upon any land for the purpose of examining and surveying the property sought to be appropriated." Ill. Comp. Stat. ch. 32/11-1 (1980). The archaeological survey entailed very intrusive digging of the property, including 50-foot long and 6-foot wide trenches, or 50-foot square holes. The court concluded that the word "survey" did not include this type of activity. 428 N.E. 2d at 279.

In *Missouri Highway & Transp. Com'n v. Eilers*, 729 S.W.2d 471, 474 (Mo. App.) *reh. denied* (1987), the Missouri court held that a soil survey amounts to a "taking" and a condemning authority may not conduct a soil survey until it receives the property owner's consent or initiates judicial proceedings to condemn property for an easement to conduct the surveys.

In *County of Kane v. Elmhurst Nat'l Bank*, 111 Ill. App. 3d 292, 443 N.E.2d 1149 (1982), the Illinois court held that authority to go onto property for surveys and examinations prior to condemnation proceedings does not include authority to make subsurface soil and geological studies. The court stated:

"Constitutional restrictions on taking and damaging without just compensation (U.S. Const., amends. V, XIV, Ill. Const. 1970, art. I, sec. 15), however, limit the permissible scope of an order authorizing entry for preliminary survey and ap-

praisal purposes. A taking may not be allowed under the guise of a preliminary survey; the right of entry does not include the right to make permanent appropriation or cause more than minimal or incidental damage to property; and the entering party is free of liability 'only to the extent that the entry or occupation is temporary, or the infliction of damage is incidental and incipient or preliminary.' [Citation omitted.] Permissible entry 'cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property.' [Citation omitted.] Thus the County may enter the property, appraise the premises, and place stakes on the property as specified. [Citations omitted.] The order ought not be read, however, as authorizing any cutting of trees or damage to crops, except insofar as these are unavoidable incidents (for which the county must pay damages) of permissible preliminary surveying. [Citations omitted.]

"Similarly the part of the order authorizing soil borings and a geologic study without the landowners' consent or a prior condemnation proceeding would be invalid even if statutorily authorized. Such drilling and excavation, even where subsequent backfilling has been required, has been properly recognized as a substantial interference with the landowners' property rights rather than a minimally intrusive preliminary survey causing only incidental damage. [Citations omitted.] Rather than hold that such drilling and surveying is authorized under a statute which we would then have to invalidate, we decline to read the power to make the contemplated soil and geologic survey into section 5-803's grant of power to 'mak[e] surveys.' [Citation omitted.]" 111 Ill. App. 3d at 298-99.

In *Eilers*, the Missouri court held that a precondemnation soil survey without the landowner's permission was an unconstitutional taking of property without just compensation. The precondemnation authority is set out in Mo. Rev. Stat. §§ 227.120(13) (2000) and 388.210(1) (2000). Section 227.120(13) provides in part:

"The state highways and transportation commission also shall have the same authority to enter upon private lands to survey and determine the most advantageous route of any state highway as granted, under section 388.210, RSMo, to railroad corporations."

Section 388.210(1) gives railroads the power

"[t]o cause such examination and survey for its proposed railroad to be made as may be necessary to the selection of the most advantageous route . . . ."

The Missouri Highway and Transportation Commission contended a soil survey is within the ambit of the "survey" authorized by the statutes. Eilers appealed.

The *Eilers* court cited other authorities which have held that the right to conduct a precondemnation survey is not authority to excavate or drill on private property. The court stated:

"In *County of Kane v. Elmhurst Nat. Bank*, 111 Ill. App.3d 292, 67 Ill.Dec. 25, 443 N.E.2d 1149 (1982), the county sought to enter private land to conduct surveys, appraisals and subsoil tests pursuant to a highway construction project. The landowners claimed the county was without authority to conduct the tests. Section 5-803 of the Illinois Road and Bridges Act permitted 'making surveys and the determination of the amount of property necessary to be taken or damaged in connection with any highway project . . . .' The court found that while surface surveys were authorized by § 5-803, subsurface and geologic surveys were not. Soil surveys 'involve substantial and not merely incidental disruption and damage to the landowners' property.' *Id.* 67 Ill. Dec. at 28, 443 P.2d at 1152. The county had to either obtain the landowner's consent for the soil survey or file a prior condemnation action before it could enter onto the land. *Id.* 67 Ill. Dec. at 30, 443 P.2d at 1154. In *Hicks v. Texas Municipal Power Agency, supra,* the court analyzed a statute virtually identical to § 388.210(1) and determined that the word 'survey' authorized a 'lineal survey' and not core drilling operations. 548 S.W.2d at 955-56. *See also, Mackie v. Mayor and Com'rs of Town of Elktown,* 265 Md. 410, 290 A.2d 500 (1972), *Jacobsen v. Superior Court of Sonoma County,* 192 Cal. 319, 219 P. 986 (1923). Finally, statutes should be construed to avoid constitutional problems. *First National Bank of St. Joseph et al v. Buchanan County et al,* 205 S.W.2d 726, 730 (Mo.1947). As discussed in the next portion of this opinion, if § 227.120(13) and § 388.210(1) are read to authorize soil surveys, they will violate constitutional restrictions on the taking and damaging of private property without just compensation.

. . . .

"The Commission proposes to enter Eilers' land with a four wheel drive wagon, drill ten to twelve holes and remove approximately five pounds of soil from the property. The Commission may also drill a two-inch core of the subsurface rock. All this is to be done without the landowner's consent. Although the soil survey is not an intrusion of an overwhelming magnitude, it is still an intrusion and interference with Eiler's rights as a private landowner. A soil survey conducted without Eilers' consent subverts his right to use and enjoy his property in fee simple absolute. This is not constitutionally permissible. Accordingly, the soil survey amounts to a 'taking' and the Commission may not conduct the soil survey until it receives Eilers' consent or initiates judicial proceedings and pays the damages for a temporary easement before entering the land. [Citations omitted.]

"While it may be burdensome for the Commission to condemn a temporary easement for a soil survey and then later condemn the entire tract for the highway, the constitutional mandate that property not be taken or disturbed without prior compensation, and the landowner's right to freely use his land supersede any efficiency concerns. In addition, the Commission has in the past apparently ob-

tained landowners' consent to conduct soil surveys." *Eilers*, 729 S.W.2d at 473-74.

In *Burlington Northern and Santa Fe Ry. Co. v. Chaulk*, 262 Neb. 235, 631 N.W.2d 131 (2001), the Nebraska Supreme Court held that investigations and tests proposed by a railroad amounted to a temporary taking and exceeded activities authorized by the eminent domain statute governing a condemner's entry upon land. The eminent domain statute authorized "any condemner . . . to enter upon any land for the purpose of examining and surveying [the] same in contemplation of bringing or during the pendency of condemnation proceedings under sections 76-701 to 76-724." Neb. Rev. Stat. § 76-702. Accordingly, Neb. Rev. Stat. § 76-702 permitted and limited the condemner's entry upon the property owners' land to "examining and surveying." The railroad argued that pursuant to the statute, it had the authority to enter upon the property owners' land to conduct geotechnical studies in which core soil samples were to be drilled approximately every quarter of a mile along a proposed bypass route. The railroad argued that its proposed "investigations" were consistent with "examining" as authorized by statute. The Nebraska court disagreed:

"Tests similar to those proposed by BNSF have been considered by other courts. It has been observed that core drilling, such as BNSF proposes to conduct upon the defendant property owners' land in the instant case, is 'an intrusion and interference with [one's] rights as a private landowner,' which 'subverts [the landowner's] right to use and enjoy [the] property in fee simple absolute.' [Citation omitted.] Such intrusion, described as 'dig[ging] up private property,' has been defined as a temporary taking, for which a temporary easement must first be obtained. [Citations omitted.]

. . . .

"The power of eminent domain must be exercised 'in strict accordance with its essential elements in order to protect the constitutional right of the citizen to own and possess property against an unlawful perversion of such right.' [Citation omitted.] The power of eminent domain may be exercised only on the occasion, and in the mode and manner, prescribed by the Legislature. [Citation omitted.] Statutes conferring and circumscribing the power of eminent domain must be strictly construed. [Citation omitted.] While the language of § 76-702 permits a condemner to enter upon land for the purpose of 'examining and surveying [the] same,' it does not permit entry for the purpose of conducting the type of physical invasion to the land proposed by BNSF. The geotechnical tests and investigations

that BNSF seeks to conduct upon the defendant property owners' land exceed the statutory authority given to BNSF under § 76-702 for which injunctive relief of entry for the purpose of conducting such tests and investigations was sought in the petition. The tests amount to a temporary taking which must be accomplished in the mode and manner prescribed by the Legislature for the exercise of the power of eminent domain. [Citations omitted.]" 262 Neb. at 244-46.

In *Hailey v. Texas-New Mexico Power Co.*, 757 S.W.2d 833, 834-35 (Tex. Civ. App. 1988), the property owner asserted that the trial court abused its discretion and erred in granting a temporary injunction prior to condemnation, allowing the condemning authority to conduct soil boring, soil testing, and subsurface investigation because such examinations constituted a "taking" of private property. The court stated:

"This suit for temporary injunction is not a condemnation proceeding, although it is intimately connected to a contemplated condemnation proceeding. And the rule is that in condemnation proceedings the requirements of the statutes are to be strictly followed and such rule is for the benefit of the landowner. [Citations omitted.]

"[The condemner] is an electric power company whose authority for condemnation arises from Articles 1435 and 1436 of the Revised Civil Statutes. Article 1436 provides that 'Such corporation shall have the right and power to enter upon, condemn and appropriate the lands, . . . of any person . . . .'

"In *Lewis v. Texas Power & Light Co.*, CCA (Dallas) NRE, 276 S.W.2d 950 (1955), the court held that Article 1436 gave electric companies the implied statutory authority to enter property prior to condemnation for the purpose of making a preliminary lineal survey with a view to selecting lands to be acquired. *Lewis* relied on prior cases interpreting *Article 6318* (giving railroads right of condemnation) to give the condemning authority (the railroad) the right to make a 'lineal survey' prior to condemnation.

"*Puryear v. Red River Authority of Texas*, CCA (Amarillo) NRE, 383 S.W.2d 818 (1964), held that the statutes granting water control districts the authority 'to go upon any lands for the purpose of making surveys' included the right for the water districts to conduct core drilling operations. *Puryear* reasoned that allowing a water district to enter and survey the land without core drilling to determine the feasibility of locating a dam on the property would be contrary to the legislative intent.

"*Hicks v. Texas Municipal Power Agency*, CCA (Houston 1st) NRE, 548 S.W.2d 949 (1977), involved *Article 6318* (relied on by *Lewis* to permit a power company to make a lineal survey prior to condemnation under *Article 1436*). The court recognized the implied authority to conduct a preliminary lineal survey prior to

condemnation (citing *Lewis*), but refused to extend this right to include core drilling under *Article 6318*.

"While Article 1436 has been expanded and interpreted in *Lewis* to allow a preliminary lineal survey prior to actual condemnation, we refuse to further erode the strict construction of our eminent domain statutes to permit core drilling or soil boring as incidental to a lineal survey. We reverse the order of the trial court insofar as it permits TNP to conduct core drilling, soil boring and subsurface soil testing on the land of appellants." 757 S.W. 2d 834-35.

Although Texas follows the rule that statutes permitting condemnation are to be strictly construed, we note that invasive drilling and coring is permitted in the state of Texas as an examination of the property to be taken for specific statutory purposes such as constructing a dam and setting up water districts. See *Puryear v. Red River Authority of Texas*, 383 S.W.2d 818 (Tex. Civ. App. 1964). In *Puryear*, a Texas court interpreted the statutory right of a water authority to "make surveys" to include the power to conduct core drilling. *Puryear* involved an injunction restraining a landowner from interfering with core drilling operations upon his land by the Red River Authority. The court affirmed the injunction, noting that the term "survey" should be interpreted in light of the authority's statutory duty to control, preserve, and develop the waters of the Red River. The court reasoned:

"To permit appellee the right to enter land and make surveys but deny it the right to conduct core drillings to determine the feasibility of locating a dam would be contrary to the clear intention of the Legislature. Surveying, without the right to test underground stratum, would be of little value to water control districts. Core drilling to determine the underground stratum is an essential step in determining the location of proposed dams." 383 S.W.2d at 821.

We note the Kansas Legislature has enacted specific statutes that allow core drilling. Under K.S.A. 65-34,108(a)(2), the Secretary of Health and Environment is authorized to enter at reasonable times any establishment or place where a storage tank is located, to inspect and obtain samples of any regulated substance contained in such storage tank and to conduct or require the owner or operator to conduct monitoring or testing of such storage tank, associated equipment, tank contents or surrounding soils, air, surface water, or groundwater. Pursuant to K.S.A. 65-170b, the Secretary of Health and Environment may enter any property or facility which

is subject to the provisions of K.S.A. 65-161 to K.S.A. 65-171j, to observe, monitor, collect samples, and examine records and facilities to determine compliance or noncompliance with state laws and rules and regulations relating to water pollution or public water supply. Municipalities are allowed by statute to enter property in an urban renewal area to make surveys, appraisals, soundings, or test borings. K.S.A. 17-4748.

The power of eminent domain must be exercised in strict accordance with its essential elements in order to protect the constitutional right of the citizen to own and possess property against an unlawful perversion of such right. The power of eminent domain may be exercised only on the occasion and in the mode and manner prescribed by the legislature. Statutes conferring and circumscribing the power of eminent domain must be strictly construed.

Here, the Unified Government's purpose for environmental testing is not to correct an environmental problem or to protect the public from groundwater pollution but to determine the economic viability of the condemnation project. We agree that environmental contamination is relevant to appraising the value of property sought to be condemned. However, subsoil testing is beyond the scope of the examination authorized by K.S.A. 26-512. Therefore, we reverse the district court's denial of National's petition for injunction.

The trial court's denial of National's petition for injunction is reversed.